[Crim. No. 771.   Fourth Dist.   Oct. 3, 1952.]

THE PEOPLE, Respondent, v. DORIS SULLIVAN et al.,
Appellants.

Richard E. Adams, A. Brigham Rose, David A. Block, John Preston, Thomas Whelan and Eli H. Levenson for Appellants.

Edmund G. Brown, Attorney General, and William E. James, Deputy Attorney General, for Respondent.

MUSSELL, J.—The defendants and appellants, together with one John J. McKenna, were accused by the grand jury of the county of San Diego of the crime of conspiracy to commit acts injurious to the public morals, to pervert or obstruct justice or the due administration of the laws, and that the said Doris Sullivan, from April, 1950, to May, 1951, was at all times the duly appointed city manager of the city of National City, county of San Diego, State of California; that while acting as said city manager, the said Doris Sullivan attended the official meetings of the duly elected city council of the said city and in her official capacity presented matters for consideration of, advised and made recommendations to, the said city council in matters pertaining to the official business affairs of the said city; that while she was so acting as said city manager of said city, the said Doris Sullivan, Eugene Albertini and Samuel Fishman and John J. McKenna did wilfully, unlawfully and feloniously conspire, combine, confederate and agree together to use the official position of city manager of the said city for an unlawful purpose, to wit: For the purpose of having the said city manager, while purporting to represent the interests of the said city, to influence and persuade the said city council of the said city to officially enact a zoning variance when the enactment of said zoning variance was in fact for the private gain of the said Doris Sullivan, Eugene Albertini and Samuel Fishman and John J. McKenna.

Three overt acts were set forth in the indictment. In overt act number one it was alleged "that pursuant to said combination, confederacy, agreement and conspiracy and to carry out the objects and purposes of the same, the defendant Samuel Fishman, appeared in the vicinity of 1205 Palm Avenue, National City, California, being the residence of Doris Sullivan, on or about the 5th day of January, 1951, in and at the County of San Diego, State of California, and then and there delivered to the said Doris Sullivan the sum of One Thousand Dollars ($1,000)." Overt act number two: "That pursuant to said combination, confederacy, agreement

and conspiracy and to carry out the objects and purposes of the same, the defendant Samuel Fishman, executed a check, drawn on the Home Owners Mortgage and Loan Company, Inc., account in the Security Trust and Savings Bank, San Diego, for the sum of Four Hundred and Thirteen Dollars and Ninety-four cents, ($413.94), dated February 24, 1951; check #1711 and the said Samuel Fishman on or about the 24th day of February, 1951, at and in the County of San Diego, State of California, delivered the said check to Doris Sullivan with a notation on said check in the following language: 'Balance of share in full, sale of first parcel of Cape Cottage home, $413.94.' '' Overt act number three: ''That pursuant to said combination, confederacy, agreement and conspiracy and to carry out the objects and purposes of the same, the defendant Doris Sullivan, appeared in the City Hall of the City of National City, on or about the 10th day of April, 1951, at and in the County of San Diego, State of California, said appearance being at a duly called meeting of the City Council of the City of National City, County of San Diego, and the said Doris Sullivan while acting in her official capacity as City Manager of the said City, did then and there urge and persuade the said City Council to enact and approve a zoning variance on certain properties in which the said Samuel Fishman and Eugene Albertini were beneficially interested.''

A prior felony conviction was also alleged as to the defendant Albertini.

A jury found the defendants Sullivan, Albertini and Fishman guilty and acquitted defendant McKenna. Motions for a new trial and applications for probation were presented by defendants and in each case denied. The trial court fined each defendant $3,500 and they were all sentenced to imprisonment in the state prison.

Numerous grounds of appeal are stated in the briefs, the primary contention being that the indictment does not state a public offense and that the statute (Pen. Code, § 182, subd. 5) is unconstitutional.

The reporter's transcript herein contains over 2,000 pages and the evidence presented by the prosecution is summarized as follows: The principal parties involved in this proceeding are Doris Sullivan, who was the city manager of National City; Sam Fishman, who was the principal stockholder of Home Owners Mortgage and Loan Company; Eugene Albertini, a promoter, who was associated with Fishman and

John J. McKenna in certain enterprises; and defendant John J. McKenna, a financier, who was found not guilty by the jury. Fred Fishman was the president of Home Owners Mortgage and Loan Company and is the son of Sam Fishman. Sol Blanc is a licensed real estate broker, employed by Home Owners Mortgage and Loan Company in December, 1950.

Fred Fishman testified that he held 500 shares of the outstanding stock of the Home Owners Mortgage and Loan Company and the remaining 14,500 shares were held by his father; that the loan company had an agreement with a syndicate composed of Sam Fishman, Eugene Albertini and John McKenna whereby they were to obtain options on property in National City; that he sent Sol Blanc to National City to get the options; that one of them, executed on or about January 4, 1951, and obtained by Blanc, was on 10 acres, to be purchased from a Mr. Taylor; that this was an option to purchase for $17,500; that this property was purchased by the loan company and resold to Cape Cottage Homes for $35,000; that the net profit to the syndicate from this sale was $9,600; that the parties who made a profit from the transaction were the defendants Doris Sullivan, Sam Fishman, Eugene Albertini and John J. McKenna; that he was informed that Doris Sullivan had joined the syndicate just prior to the 24th of February, 1951, and he was told that she was the fourth party for the distribution of the profits; that he kept the records and distributed the profits from the Taylor transaction; that at the instance of his father he prepared People's exhibit three which was a check drawn on the account of the mortgage and loan company on Security Trust and Savings Bank, payable to cash, for $1,000, signed by S. E. Fishman, with a notation "loan to Doris Sullivan" and endorsed to S. E. Fishman; that he also prepared People's exhibit four, a check drawn on January 15, 1951, on the account of the mortgage and loan company, on the same bank, payable to cash in the sum of $1,000, signed by S. E. Fishman, and also bearing the notation "loan to Doris Sullivan"; that People's exhibit five was a check drawn on the same bank, on the same account, dated February 24, 1951, payable to cash in the sum of $413.94; that it was signed by S. E. Fishman and contained a notation "balance of share in full. Sale of first parcel to Cape Cottage Homes, $413.94"; that the signature on the back of this check was that of defendant Doris Sullivan. The witness also identified records showing that Eugene Albertini received a check for

$500, advance against profits from sale of the Taylor property, and later received the sum of $1,931.44 of his share in full; that McKenna received $2,433.94 from the sale; that the syndicate had options on approximately 400 acres but the Taylor property was the only one that resulted in a sale.

Sol Blanc testified that he obtained the option on the Taylor property; that in a conversation during December, 1950, with Fred and Sam Fishman, Albertini and McKenna, he received instructions from Sam Fishman that he was to go out and get options in National City and that Doris Sullivan would assist him; that the Taylor property was R-1-A. agricultural property and that he understood that defendant Sullivan would take care of the zone variances if it became necessary; that defendant Sullivan told him that she would take care of the zoning variance; that he went with defendants Sam Fishman and John McKenna to defendant Sullivan's house during the first week in January, 1951; that defendant Fishman stated that he was to give defendant Sullivan $1,000 and that he wanted to be sure that he had the cash; that on the return from this trip, defendant Sam Fishman stated to McKenna that he had given Doris Sullivan $1,000 and that "he had her where he could hold her in the future"; that Sam Fishman told him that Mrs. Sullivan would annex property or rezone in National City; that she had power over the planning commission and the city council; that he had a conversation with Mrs. Sullivan and a Mr. Gordon in Mrs. Sullivan's office concerning the zoning of this property; that Mr. Gordon was a buyer for an organization known as the Cape Cottage Homes Corporation; that he asked Mrs. Sullivan about the rezoning and she assured him that it would be done; that some time in January, 1951, he met Taylor, the owner of the Taylor property, at defendant Sullivan's office in National City, where she had the petition for variance of the property ready; that he later made another trip to defendant Sullivan's house and at this time defendant Fishman showed him another $1,000 which he was taking to her; that when they arrived at the house, Fishman took Mrs. Sullivan to another room and later informed Blanc that he was tired of giving her money; that it was the last time he was going to give her any money and when asked how much he had given her to that date, he said "$2,000"; that Fishman said that if there were any zone variances that worried Blanc he, Fishman, would see that the property was rezoned; that in February the loan company

refused to pay his commissions and he went to Mrs. Sullivan and was informed by her that she had nothing to do with the agreement between Blanc and Fishman; that he then informed Mrs. Sullivan that he knew she was going to receive compensation for the sale of the Taylor acreage and defendant Sullivan then said "You won't be able to prove it. I will term it hearsay. I have studied law and I know how to protect myself"; that in a conversation with the defendant Sullivan about what she had done to be entitled to a share in the Taylor profits she said "If it wasn't for my getting the planning commission or council to rezone it, it would still be out there unzoned."

Mr. Taylor testified that he went with Blanc to sign a petition for variance; that the petition was handed to him by a man named Simmons (secretary to defendant Sullivan) and notarized by Oscar L. Harkey (also in defendant Sullivan's office); that he attended a council meeting on January 8, 1951, at which Doris Sullivan was present and at which the question of zone variance was discussed.

Robert Gordon, who was associated with a construction corporation which owned the Cape Cottage Homes, testified that when the property was purchased the corporation felt that there would be no objection to the zoning of the property for multiple dwellings as there was no objection from any of the members of the commission nor the council; that he had been told by defendant Albertini to attend a council meeting on January 9th and that they could go ahead and purchase the property; that he would not have made the purchase if he had any reason to believe that the property would not be rezoned for multiple dwellings.

Edwin Campbell, city attorney of National City, testified that on April 10, 1951, he attended a meeting of the city council where the question of the adoption of the final map of the Taylor property was discussed and a motion was made to adopt it. Campbell made an objection and stated that it was necessary that there be an agreement between the subdivider and the water company before the city could accept the final map. Defendant Doris Sullivan then recommended the adoption of the final map.

Mrs. Alston, city clerk, testified that during the time Mrs. Sullivan was city manager her recommendations and proposals were generally accepted by the council and that everything that came before the council went through defendant Sullivan; that she had received instructions from Mrs. Sullivan to

the effect that all land transactions were to be handled in the city manager's office; that Mrs. Sullivan did not disclose to members of the city council or planning commission that she had a private interest in the Taylor transaction.

The mayor of National city testified that he was a member of the city council prior to June, 1951; that Mrs. Sullivan appeared at numerous times before the council and gave advice concerning various administrative matters and that as to most matters the council accepted her recommendations; that as to matters of zone variances which were brought before the council, they relied on the planning commission's recommendations; that if it had been brought to his attention that Mrs. Sullivan was to make a substantial profit on the Taylor property, he would not have voted for the zoning variance.

An investigator for the district attorney testified that he had a conversation with the defendant Sam Fishman on or about September 5th in which Fishman stated that he knew defendant Sullivan; that he was interested in obtaining land in and around National City in connection with housing projects; that he had made two loans to Mrs. Sullivan; that he did not split any moneys with Doris Sullivan and that he had not been interested with Mrs. Sullivan in any real estate transactions in National City; that he had a conversation with defendant Albertini in which he asked Albertini about the division of the profits with Mrs. Sullivan; that Albertini stated that he was interested in promoting multiple dwelling housing in National City; that he had seen Mrs. Sullivan and talked to her; that he had not offered her any money for any services that she had given in the past or would give in the future and that as far as he was concerned, Doris Sullivan had no interest in any real property transaction in which he or Gordon were concerned.

A copy of an ordinance of National City defining the powers and duties of the city manager was introduced in evidence. The pertinent provisions of the ordinance are as follows:

"Section 2. The City Manager shall be the administrative head of the City Government under the direction and control of the Council, except as otherwise provided by Ordinance. The City Manager shall be responsible to the City Council for the efficient administration of all the affairs of the City which are under the City Manager's control. In addition to the City Manager's general powers as administrative head and

not as a limitation therein, it shall be the duty and the City Manager shall have power:

"1. To see that all laws and ordinances are duly enforced.

"3. To exercise control over all departments and divisions of the City Government and over all appointive officers and employees thereof subject to the approval of the City Council, except as herein provided.

"4. To attend all meetings of the Council and its committees unless excused therefrom by the Council or the committee . . .

"5. To recommend to the Council for adoption such measures and ordinances as are deemed necessary or expedient.

"10. To make investigations into the affairs of the City or any department or division thereof or any contract, or the proper performance of any obligation running to the city."

The foregoing summary states, in substance, the testimony and evidence introduced by the prosecution to prove that the four defendants entered into a conspiracy to purchase or option land in National City, to obtain any necessary rezoning of the property through the use of the official position of the city manager and to sell the property at a profit for themselves in violation of section 182 of the Penal Code.

The first contention of appellants is that the indictment does not state a public offense and that Penal Code, section 182, subdivision 5, is unconstitutional. We conclude that this contention is untenable.

The statute, so far as is here applicable, provides as follows:

"[Criminal conspiracy: Acts constituting: Punishment: Venue.] If two or more persons conspire:

"1. To commit any crime;

"5. To commit any act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due administration of the laws,"

they are punishable as stated in the section.

The constitutionality of this statute was directly passed upon in the case of *Lorenson* v. *Superior Court*, 35 Cal.2d 49, where the court said, at pages 59, 60 and 61 [216 P.2d 859]:

"Section 182 defines as criminal conspiracy acts committed with the purpose '. . . to pervert or obstruct justice, or the due administration of the laws.' Generally speaking, conduct which constitutes an offense against public justice, or the administration of law includes both malfeasance and nonfeasance by an officer in connection with the administration

of his public duties, and also anything done by a person in hindering or obstructing an officer in the performance of his official obligations. Such an offense was recognized at common law and generally punishable as a misdemeanor. Now, quite generally, it has been made a statutory crime and, under some circumstances, a felony. (Burdick, Law of Crimes [1946], vol. 1, p. 382 et seq.; 20 Cal.Jur. 347-354.)

"In California, the statutes relating to 'Crimes Against Public Justice' are found in part I, title VII, of the Penal Code. Bribery, escapes, rescues, perjury, falsifying evidence, and other acts which would have been considered offenses against the administration of justice at common law are made criminal by legislative enactment. Section 182, subdivision 5, is a more general section making punishable a conspiracy to commit any offense against public justice. The meaning of the words 'to pervert or obstruct justice, or the due administration of the laws' is easily ascertained by reference either to the common law or to the more specific crimes enumerated in part I, title VII. A conspiracy with or among public officials not to perform their official duty to enforce criminal laws is an obstruction of justice and an indictable offense at common law. (*People* v. *Tenerowicz,* 266 Mich. 276 [253 N.W. 296].) . . .

"To comply with the constitutional requirement of due process of law, the crime for which a defendant is being prosecuted must be clearly defined, but it is only necessary that the words used in the statute be well enough known to enable those persons within its reach to understand and correctly apply them. 'To make a statute sufficiently certain to comply with constitutional requirements it is not necessary that it furnish detailed plans and specifications of the acts or conduct prohibited.' (*People* v. *Smith,* 36 Cal.App.2d Supp. 748, 752 [92 P.2d 1039].)

"Considering the well-settled meaning at common law of the words 'to pervert or obstruct justice or the due administration of the laws,' the other and more specific provisions in the Penal Code concerning 'Crimes Against Public Justice,' and the relative certainty of words employed in statutes which have been held valid, it cannot be said that subsection 5 of section 182 of the Penal Code is unconstitutional. For substantially the same reasons, the indictment against Lorenson is not vague, indefinite, or uncertain and it complies with the statutory requirement for such an accusation. Section 952 of the Penal Code allows an indictment to be stated 'in the

words of the enactment describing the offense or declaring the matter to be a public offense, or in any words sufficient to give the accused notice of the offense of which he is accused.' Lorenson was indicted in the terms of the 'enactment describing the offense,' and the grand jury has fairly informed him of the acts of which he is accused to the extent which will enable him to defend himself. (*People* v. *Emmons,* 13 Cal. App. 487, 492 [110 P. 151].)''

In *People* v. *Cossey,* 97 Cal.App.2d 101, 110 [217 P.2d 133], this court held that the offense designated in section 182 of the Penal Code may be to do a number of things which are specifically set forth in subdivisions 1, 2, 3, 4, and 5 of the section and that the gist of the charge is conspiracy and all of the objects of such a conspiracy may be the object of one charge. In *People* v. *Johnson,* 22 Cal.App. 362, 364 [134 P. 339], it was held that to do all of the things enumerated in different subdivisions of the section amounts to a single offense only. And in *People* v. *MacPhee,* 26 Cal.App. 218, 221 [146 P. 522], it is held that the language of section 182 of the Penal Code is inclusive and elastic enough to permit the framing of an indictment charging a conspiracy to do or permit the doing of any or all of the illegal acts referred to therein. (See, also, *People* v. *Gilbert,* 26 Cal.App.2d 1, 6 [78 P.2d 770].) When we examine the indictment in the instant case in the light of these decisions, it is apparent that the defendants herein were fully advised in the charging part of the indictment of the accusation that the defendant Doris Sullivan attended the official meetings of the city council of National City, advised and made recommendations to the council in matters pertaining to the official business affairs of the city, and that while acting as city manager, the said Doris Sullivan and the other defendants did wilfully, unlawfully and feloniously conspire and agree together to use the official position of the city manager for an unlawful purpose, to wit, for the purpose of having the city manager, while purporting to represent the interests of said city, to influence and persuade the city council to officially enact a zoning variance when said enactment was in fact for the private gain of said defendants.

Section 70 of the Penal Code provides as follows:

"[Solicitation or acceptance of gratuities by public officers or employees.] Every executive or ministerial officer, employee or appointee of the State of California, county or city therein or political subdivision thereof, who knowingly asks,

receives or agrees to receive any emolument, gratuity or reward, or any promise thereof excepting such as may be authorized by law for doing an official act, is guilty of a misdemeanor.''

In the instant case the evidence shows that defendant Sullivan, as city manager, was required by law to see that all laws and ordinances of the city were duly enforced, to attend all council meetings and to recommend for adoption such measures and ordinances as were deemed necessary or expedient. It was her official duty to present the petition for variance to the planning commission and city council. The record contains substantial evidence showing that for the performance of these official acts she unlawfully received substantial sums of money pursuant to agreement with her codefendants. Under such circumstances the evidence is sufficient to show a violation of section 70 of the Penal Code and the indictment sufficiently charges a conspiracy to violate section 182 of the same code. ■■■ The proven acts and conduct of the defendants constituted an offense against public justice and the administration of the law as defined in *Lorenson* v. *Superior Court, supra.*

Appellants rely upon the case of *Musser* v. *State of Utah,* 333 U.S. 95 [68 S.Ct. 397, 92 L.Ed. 562]. In that case the Supreme Court considered the constitutionality of a Utah statute under which the defendants were convicted of conspiracy ''to commit acts injurious to public morals. . . .'' The statute defined conspiracy: '' (5) To commit any act injurious to the public health, to public morals, or to trade or commerce, or for the perversion or obstruction of justice or the due administration of the laws . . .'' The defendants were charged with the crime of conspiracy to counsel, advise and practice polygamous or plural marriage. The court did not presume to give an interpretation as to what the statute included and stated that standing by itself, it would seem to be warrant for conviction for agreement to do almost any act which a judge and jury might find at the moment contrary to his or its notions of what was good for health, morals, trade, commerce, justice or order; that statutes defining crimes may fail of their purpose if they do not provide some reasonable standards of guilt and may be unconstitutional in not advising defendants of the nature of the offense with which they are charged, or to guide courts in trying those who are accused. The court further said:

''We recognize that the part of the statute we have quoted does not stand by itself as the law of Utah but is part of the whole body of common and statute law of that State and is to be judged in that context. . . . What the statutes of a State mean, the extent to which any provision may be limited by other Acts or by other parts of the same Act, are questions on which the highest court of the State has the final word. The right to speak this word is one which State courts should jealously maintain and which we should scrupulously observe.''

The court then restored the controversy to the Supreme Court of Utah and that court, in *State* v. *Musser*, —— Utah —— [223 P.2d 193], held that the statute was void for vagueness and uncertainty under the Fourteenth Amendment to the Federal Constitution. Our Supreme Court has ruled on the question of the constitutionality of a similar conspiracy statute in *Lorenson* v. *Superior Court, supra,* and that ruling is binding upon us. Furthermore, in the instant case the defendants were fully advised as to the nature of the offense with which they are charged, which was not the situation in the Musser case.

█ Officers of a municipal corporation, like those of private corporations, are agents of the corporate body, and may not use their official position for their own benefit, or for the benefit of anyone except the municipality itself, and may not represent the corporation in any contract or transaction in which they are personally interested in obtaining an advantage at the expense of the corporation, for in such cases the city would not have the benefit of their unbiased judgment. (18 Cal.Jur., § 253, p. 978; *Capital Gas Co.* v. *Young,* 109 Cal. 140, 143 [41 P. 869, 29 L.R.A. 463].) █ Proof of the private interest of the defendant Sullivan in the passage of the zone variance in question and her presentation of the variance petition for her own advantage establishes malfeasance in connection with the administration of her public duties.

█ Appellants next argue that the verdict of the jury is contrary to the law and the evidence and argue that the handing of certain sums of money to Doris Sullivan did not constitute an overt act in furtherance of the conspiracy. This argument is without merit. The acts of the conspirators in delivering to the city manager the sum of $1,000 on one occasion, and, as alleged in the second overt act, the sum of $413.94 on another occasion, were acts in furtherance of the

conspiracy. These payments assured the accomplishment of the object of the conspiracy to use the official position held by defendant Sullivan for the obtaining of a zoning ordinance.

An overt act need amount to no more than an act showing that the conspiracy has gone beyond the state of a mere meeting of the minds upon the attainment of an unlawful object and that action between conspirators as such has begun. (*People* v. *George*, 74 Cal.App. 440, 456-457 [241 P. 97].)

It is contended that proof that defendant Sullivan requested the city council on April 10, 1951, to accept the final subdivision map is not proof of the third overt act alleged. In this overt act it was alleged that appellant Sullivan in her official capacity as city manager urged and persuaded the city council to enact and approve a zoning variance. The accomplishment of the purpose of zone variance was effected by the approval of the subdivision map.

It is contended that the witnesses Sol Blanc and Fred Fishman were accomplices and that there was no corroboration of their testimony. We need not pass upon the question of whether these parties were accomplices because their testimony was in fact amply corroborated. The checks showing the distribution of the proceeds of the sale of the Taylor property, the testimony of the various city officials and members of the planning commission and city council as to the activities of the city manager in connection with the Taylor property, the false and equivocal statements of the defendants Sam Fishman and Eugene Albertini to the investigator for the district attorney's office, furnish adequate corroboration of the testimony of the witnesses Blanc and Fishman. The entire conduct of the parties, their relationship, acts and conduct during and after the crime may be taken into consideration by the jury in determining the sufficiency of the corroboration. (*People* v. *King*, 33 Cal.App.2d 538, 542 [92 P.2d 510]; *People* v. *Ross*, 46 Cal.App.2d 385, 395 [116 P.2d 81].) The evidence is sufficient if it tends in some slight degree at least to implicate the defendants. It need not be strong. (*People* v. *Negra*, 208 Cal. 64, 69 [280 P. 354]; *People* v. *Malone*, 82 Cal.App.2d 54, 61 [185 P.2d 870].)

Appellants contend that the trial court erred in its decision on questions of law arising during the trial. In this connection it is first argued that the court erroneously admitted in evidence a transcript of the city council meeting of April 10, 1951. Appellant Fishman contends that this evidence was not binding upon him because he was not present

at the meeting and he argues that the alleged conspiracy had been terminated and completed; that the division of the net profits from the sale of the Taylor property was made February 24, 1951, and that the action of the city council approving the recommendation of a zone variance was taken March 6, 1951. The record shows that the "syndicate" had about 400 acres of land under option and there is nothing to indicate that there was any intention to terminate the conspiracy on the sale of the Taylor property. Under the circumstances shown, this evidence was admissible.

Appellant Fishman contends that his cross-examination was improper in that it exceeded the scope of the direct examination in which Fishman was asked by his counsel if he had made certain statements to the witness Sol Blanc concerning a combination of partners which included defendant Sullivan. The prosecution was permitted, over objection, to cross-examine Fishman at length concerning testimony he had previously given before the grand jury concerning the partnership and division of profits. The trial court limited the cross-examination to the time and events concerning the conversations which were denied by Fishman on direct examination. ▪ It was proper to permit cross-examination of Fishman as to all facts and denials which were necessarily implied from his testimony in chief. (*People* v. *Kynette*, 15 Cal.2d 731, 752-753 [104 P.2d 794].)

▪ It is claimed that the court erred in permitting cross-examination of defendant Sullivan as to the source of a deposit in her bank account made on or about April 27, 1951, of the sum of $4,400 in currency. The cross-examination was proper since it was the contention of defendants that Mrs. Sullivan "borrowed" certain sums of money in January, 1951, in order to pay certain pressing debts. Evidence of defendant Sullivan's financial condition was presented by the defense and the cross-examination was proper under the circumstances. We find no prejudicial error in the rulings of the trial court on the admission or rejection of this evidence.

▪ The next contention is that the court misdirected the jury in matters of law in instructing the jury, and in its failure to give instructions requested by the defendants. Appellant Sullivan contends that the court erred in failing to give an offered instruction that Sol Blanc was an accomplice as a matter of law. Where, as here, the question was left to the jury whether Blanc was an accomplice, it was one of fact and there was no prejudicial error in refusing to give the

requested instruction. Fred Fishman testified, on cross-examination, that he did not participate in the conspiracy and that he did not consider Sol Blanc a fifth member of the syndicate. This was also admitted by defendant Sam Fishman. As was said in *People* v. *Griffin,* 98 Cal.App.2d 1, 22 [219 P.2d 519]:

"It is settled law that if there is a disputed question of fact as to whether a witness was or was not an accomplice, the jury must decide. (Citing cases.) Likewise, it is for the jury to determine, when the evidence is conflicting, whether a witness was an actual or a feigned accomplice. (Citing cases.) As pointed out in *People* v. *Gibbs,* 87 Cal.App. 177 [261 P. 1057], an accomplice usually comes upon the stand admitting his complicity in the commission of the offense. But where complicity is denied it becomes a question for the jury when the facts are disputed or susceptible of different inferences."

Appellant Sullivan also contends that cautionary instructions in regard to the testimony of an accomplice should have been given; that the court failed to instruct the jury that the testimony of an accomplice must be corroborated in order to sustain a conviction as required by Penal Code, section 1111, and that she was entitled to an instruction that corroborative evidence which raises no more than grave suspicion of guilt is insufficient upon which to base a conviction. These contentions are without merit. The trial court gave the required cautionary instruction and also properly instructed the jury on the sufficiency of the corroboration required of the testimony of an accomplice and the manner in which it must be supplied.

Appellant Fishman complains of the instructions given to the jury concerning public officers. These instructions contain the language of section 70 of the Penal Code, *supra,* and the jury was told that the evidence must convince them beyond a reasonable doubt of the following three necessary elements or facts: 1. That the defendant Doris Sullivan was a public official at the time of the alleged offense; 2. That there was an agreement, either formal or through a tacit mutual understanding between or among the defendants; that the defendant Doris Sullivan as such public official did aid, assist or influence or did attempt to aid, assist or influence, any matter involving real estate within the city of National City for the private gain of one or more of the defendants; and 3. That one or more of the defendants committed one or more of the overt acts alleged in the indictment and that said defendants committed said acts with a specific

intent to commit the crime here charged. In view of what we have heretofore said concerning the sufficiency of the indictment and the statement of an offense therein, the instructions given in this connection were not erroneous.

Appellants next contend that it was error for the court to instruct the jury, after their return for additional instructions, that they should render a verdict as to the defendants on whose innocence or guilt they were in agreement. The trial court instructed the jury that in conspiracy cases, the case must be considered as to each defendant and that if they found a criminal combination to exist they should determine which, if any, of the defendants were parties to such conspiracy. We have examined the other instructions given and refused and conclude that the trial court fully and fairly instructed the jury and that no error was committed by the court in instructing the jury.

■■■■ Appellant Albertini contends that the court erred in its instruction to the jury that the prior offense of which he was convicted in Massachusetts was, as a matter of law, a felony, and that the portion of the judgment which finds the defendant Albertini had suffered a prior felony conviction should be reversed. The record shows that the conviction involved was of "the offense of conspiracy to break and enter in the night time the shop . . . with intent therein to commit larceny, a felony." The Massachusetts statutes applicable and then in effect (December 16, 1934) provided as follows: "Section 1. Felony and misdemeanors—a crime punishable by death or imprisonment in the state prison is a felony. All other crimes are misdemeanors." (Ann. Laws of Mass., vol. 9, chap. 274, § 1.) "Section 16. Breaking, at night time, building or ship—whoever in the night time breaks and enters a building, ship or vessel, with intent to commit a felony shall be punishable by imprisonment in the state prison for not more than twenty years." (Ann. Laws of Mass., vol. 9, chap. 266, sec. 16.) Under these statutes the prior offense charged was a felony. (*Wax* v. *McGrath,* 255 Mass. 340 [151 N.E. 317].)

■■■■ Under California law such a charge is a felony unless and until punishment in a county jail is decreed by the court. (*People* v. *Williams,* 27 Cal.2d 220, 229 [163 P.2d 692].) Under such circumstances the instruction was properly given.

Applications for admission to bail pending appeal in the instant action were heretofore made by defendants Doris Sullivan and Sam Fishman. These applications were denied by this court for the reasons set forth in *People* v. *Sullivan,*

110 Cal.App.2d 4 [242 P.2d 348]; *In re Fishman,* 109 Cal. App.2d 632 [241 P.2d 605], and *In re Fishman,* 109 Cal.App. 2d 634 [241 P.2d 603]. In view of our conclusion that the judgments herein must be affirmed, the subsequent applications for admission to bail filed herein by each of the defendants are denied.

The judgments and the orders denying motions for a new trial, and denying motions in arrest of judgment, are affirmed.

Barnard, P. J., and Griffin, J., concurred.

The petitions for a rehearing were denied October 17, 1952, and appellants' petitions for a hearing by the Supreme Court were denied October 30, 1952. Carter, J., and Schauer, J., were of the opinion that the petitions should be granted.