[Crim. No. 38923. Second Dist., Div. Five. Sept. 14, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM MARTIN et al., Defendants and Appellants.

COUNSEL

H. Anthony Miller, Lee Belgum, Belgum & Belgum, Richard A. Walton and G. Merle Bergman for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Shunji Asari and Gelacio L. Bayani, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

HASTINGS, J.—Appellant William Martin was a judge in the Citrus Municipal Court, a position he held for 20 years before his retirement in September 1977. Appellant Waldo A. Brown was an attorney in the community served by that court. This case involves the improper disposition of some 85 misdemeanor cases in which the defendants were charged with driving under the influence of alcohol and/or drugs (former Veh. Code, § 23102, now § 23152). In each case, Martin was the judge and Brown was the defense attorney. In a five-count indictment returned by the Los Angeles County Grand Jury, appellants were charged as follows: Count I, conspiracy to obstruct justice (Pen. Code,

§ 182, subd. 5), consisting of 10 overt acts; count II, conspiracy to falsify documents (Pen. Code, §§ 182 and 134), consisting of 10 overt acts; count III, conspiracy to falsify public records (Pen. Code, § 182 and Gov. Code, § 6200), consisting of 10 overt acts; count IV, falsifying documents (Pen. Code, § 134); and count V, falsifying public records (Gov. Code, 6200).

Appellants' motion to set aside the indictment (Pen. Code, § 995) was granted as to counts II through V, but denied as to count I. After a court trial, both Martin and Brown were found guilty of conspiracy to obstruct justice, as charged in count I of the indictment, and were sentenced to state prison for the term prescribed by law. These appeals followed.

Martin contends: (1) Penal Code section 182, subdivision 5, is void for vagueness and uncertainty; (2) there was insufficient evidence to establish that he was guilty of conspiracy to obstruct justice; (3) he was wrongly deprived of a postindictment preliminary hearing; and (4) the court should not have sentenced him to state prison.

Simply stated, Brown's contention is that the facts of this case do not support a conviction for conspiracy to obstruct justice because none of his or Martin's actions constituted criminal conduct.

For purposes of trial, the cases forming the basis of the prosecution were divided into five categories, based upon the type of disposition made. All of the dispositions occurred during the period between May 4, 1976, and September 17, 1977, when Martin retired. The purpose of presenting the cases in categories was to show that, in cases involving clients of Brown, Martin deviated from his normal practices and in fact handled the dispositions of these cases without the participation, consent, or knowledge of the district attorney's office. The various categories and dispositions were as follows:

I. *Drunk Driving Reduced to Reckless Driving.*

A misdemeanor complaint would be filed charging the defendant with driving under the influence. It was a common practice in Citrus Municipal Court to add a second count to the complaint, charging the lesser offense of reckless driving, to permit the defendant to enter a guilty plea to the second count, and then dismiss the drunk driving charge.

It was the policy of the district attorney's office to oppose a reduction of the charge where the defendant's blood alcohol level was over .15, or where the defendant had refused to submit to a blood alcohol test. In such cases, the trial deputy assigned to a particular courtroom had no discretion to agree to a reduction; it would have to be approved by the head deputy, and approval was rarely granted. For all of the cases in this category, the circumstances were such that the district attorney's office would oppose the reduction, yet the docket sheets showed that the reduction had been agreed to by the deputy district attorney handling the case. The deputies named on the docket sheets testified that they had either not participated in the cases, or that they did not, and would not have, approved the reductions.[1] Most of the cases involved high blood alcohol readings (.15 to .24) or refusals to take a blood alcohol test. There were other irregularities, however: the purported approval of a deputy who was on vacation at the time, two deputies appearing on the same case on the same day, or the absence of the pretrial settlement of constitutional waiver forms normally required by Judge Martin.

II. *Prior Convictions Declared Unconstitutional.*

In these cases, the complaints alleged that the defendant had suffered a prior conviction for driving under the influence within the past five years, under which circumstances the defendant could receive an enhanced penalty. Judge Martin would declare the prior convictions to be unconstitutional and would strike them from the complaints. Deputy District Attorney Arthur Godinez, who was the regularly assigned deputy in Judge Martin's courtroom from May 1976 to September 1977, testified that it was Judge Martin's policy to allow him to examine the docket sheets and argue the validity of the prior convictions before the judge ruled on whether or not the priors should be stricken. However, Godinez did not so argue against Brown, even though his name appeared on the docket sheets as having participated in the disposition of the cases. He testified that he could not have participated in the dispositions because all of them involved unquestionably valid priors. In a number of these cases, the dispositions were made during the two days prior to Martin's retirement.

---

[1] It was not uncommon in the Citrus Municipal Court for cases to be disposed of without a deputy district attorney present, since that branch of the district attorney's office was severely understaffed. A deputy would give his approval of a certain settlement and the defense attorney would report that approval to the judge handling the case. However, in the cases at issue here, either the approval of a deputy was never obtained, or the ultimate dispositions were not those approved by the deputies.

### III. *Guilty Pleas Declared Unconstitutional.*

Once again, Judge Martin deviated from his normal routine. Several deputy district attorneys and defense attorneys testified that Judge Martin was regarded as being very meticulous about taking guilty pleas, advising defendants of their rights, and obtaining the necessary waivers of those rights. In cases involving Brown's clients, Martin struck as unconstitutional guilty pleas which he himself had accepted. Most of these dispositions occurred during the two days prior to Martin's retirement; the guilty pleas were taken on September 15, 1977, and stricken on September 16, 1977. Again, these dispositions were made without the participation or knowledge of the district attorney.

### IV. *48 Hours Credit for Presentence Custody.*

When a defendant had a prior conviction for driving under the influence, a judge was required to sentence him or her to 48 hours in county jail, even if the defendant was granted probation. This also was the normal policy of Judge Martin. However, in Brown's cases, the docket sheets indicated that the defendants were given credit for having served 48 hours in county jail, when in fact they had served much less. In all but two cases, the defendants spent only four to six hours in jail; of the remaining two, one spent approximately twelve hours, and the other spent less than one day.

### V. *Fine Reduced Without Requiring DUI School.*

Judge Martin had a standard sentence that he imposed for first offenders: 30 days in county jail, suspended, summary probation of one year, a fine of $190.50, and required attendance at a D&A (drug and alcohol) or DUI (driving under the influence) school. If no school was required, the fine would be increased to $315.50. In Brown's cases, the fine was reduced to $150 without a requirement that the defendant attend school.

Although the People did not contend that the dispositions in this category were improper (sentencing being within the discretion of the judge), the prosecution introduced evidence regarding these five cases in order to show that Martin gave favored treatment to the clients of Brown.

The People presented the testimony of some 24 witnesses, including judges, court employees, present and former deputy district attorneys,

and defense attorneys. This testimony showed the procedures involved with respect to Brown's cases, and how these procedures deviated from the normal policies of the court, the district attorney's office, and Judge Martin himself.

Carrolle Aldrich, the chief administrative officer and custodian of records for the Citrus Municipal Court, testified about the procedure used when preparing cases for calendar. Each day, the court staff would prepare a calendar of cases to be heard the next day, and would pull the docket sheets and corresponding court files for those cases. The docket sheets were the court's permanent records, with entries showing the action taken on a case, and the court files contained the arrest reports. The docket sheets and files would be picked up by the clerks from the various divisions of the court; assignment of cases was by alphabetical breakdown.

It was not unusual for cases to be "advanced"[2]; that is, removed from the calendar and assigned to a particular courtroom. Cases were advanced at the request of the court, the district attorney, the public defender or a private attorney. Brown often advanced cases, and in fact came into the clerk's office almost every day for that purpose. It was Brown's custom to advance cases to Martin's courtroom, and since Brown was well known to the court staff, he was permitted to hand carry court files and docket sheets.

Martin's courtroom staff consisted of Margaret Essenwine, the court clerk, and Matthew Kapp, the bailiff. Mrs. Essenwine testified that Judge Martin did most of his work from the bench, and rarely saw attorneys in chambers. Those who did meet with the judge in chambers were admitted by Matt Kapp, who had "control" over the courtroom and knew which attorneys the judge would see, and which he would not.

Mrs. Essenwine testified that Brown would come to Judge Martin's courtroom several times a week. He rarely had his client with him, and would enter pleas himself 90 percent of the time. None of these pleas were entered in open court; in fact, the only time Brown appeared in open court was to continue cases. More commonly, dispositions on Brown's cases would be reached during periodic in-chambers meetings between Brown and Judge Martin. Whenever a stack of cases would pile up on Mrs. Essenwine's desk, Brown would be notified and would

---

[2] Of the 90 cases which were the subject of the trial, 85 had been advanced.

come in and take care of them. Brown and Matt Kapp would go into Judge Martin's chambers, and Kapp would later return the cases to Mrs. Essenwine, with instructions about the disposition in each case either pencilled in the margin of the docket sheet, or written on a small note attached to the docket sheet or the file. Although other attorneys had cases stacked on Mrs. Essenwine's desk, their pleas would be entered in open court.

Matthew Kapp testified under a grant of immunity. Kapp stated that Brown and Judge Martin would meet in the judge's chambers, with no deputy district attorney present. After these meetings, either Brown or the judge would advise Kapp about the disposition of the cases, and Kapp would instruct the court clerk as to what entry should be made on the docket sheet.

During the two or three days prior to Judge Martin's retirement, there were a large number of Brown's cases handled in chambers.

During the early part of August 1977, the irregular procedure used for Brown's cases came to the attention of Deputy District Attorney Patrick Dixon, who became suspicious about the disposition of one of his cases on which Brown was the defense attorney. Dixon went to Chief Deputy Ronald Bowers, who instructed Dixon to locate the file. After a three-day search, Dixon found the file in Martin's courtroom. There was no entry on the docket sheet for August 5, 1977, the date Brown had told him the plea was entered in the case. The docket sheets on other Brown cases (all of which were in the same pile) also lacked current entries. Dixon copied the Brown docket sheets which were in the stack of files on Mrs. Essenwine's desk, awaiting disposition, signed the copies in the presence of Chief Deputy Ronald Bowers, and returned the originals to Mrs. Essenwine. The docket sheets were pulled again after the cases had been disposed of and shown to the deputies whose names appeared on the sheets. These deputies later testified that they had not participated in or approved the dispositions.

Martin testified in his own defense. He stated that he had known Brown since the early 1960's, when Brown was a deputy district attorney who appeared in Martin's court. He admitted meeting with Brown in chambers, as well as with other attorneys, but denied that he knowingly participated in the improper dispositions of any cases. When he did meet with Brown, Brown would represent to him that a deputy district attorney had agreed to a particular disposition in a case, and

Martin would take Brown's word for it and instruct Matt Kapp or the court clerk to make an appropriate entry in the docket sheet. In essence, Martin's defense was that he trusted Brown, as well as several other defense attorneys, and accepted their word as to whether or not a particular disposition had been approved by the district attorney, or was in accordance with the district attorney's policy or the policy followed in other courts.

Brown had originally planned not to testify, but changed his mind after the testimony of Martin because he felt that the true story had not been told. Brown admitted that he had lied to deputy district attorneys about particular dispositions in order to get better deals for his clients, and avoid having them appear in court. In Judge Martin's courtroom, Brown dealt directly with Matt Kapp, and eventually Brown would tell Kapp what dispositions he had reached with the district attorney and those dispositions would find their way to the docket sheets. Brown testified that Martin had nothing to do with the dispositions in categories II, IV and V, because he and Kapp alone had worked out the dispositions in those cases. Dispositions in other cases were made on the representation of Brown that such dispositions were common practice in other courts. In short, Brown attempted to completely exonerate Judge Martin.

Brown's testimony was rebutted by Matt Kapp, who testified that instructions regarding the disposition of Brown's cases would come from Judge Martin himself. Kapp could not remember a single instance in which he and Brown alone worked out the disposition of a case. Many times, Brown would come into the courtroom and ask to see the judge, but just as many times Kapp saw Brown enter the judge's chambers from the hallway.

### APPELLANT MARTIN'S CONTENTIONS

1. *Penal Code section 182, subdivision 5, is unconstitutionally vague.*

█ Penal Code section 182, subdivision 5, prohibits a conspiracy "[t]o commit any act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due administration of the laws." Martin contends that this statute is unconstitutionally vague. This contention is contrary to the holding in *Lorenson v. Superior Court* (1950) 35 Cal.2d 49 [216 P.2d 859], and other California cases. (*Davis v. Superior Court* (1959) 175 Cal.App.2d 8 [345 P.2d 513]; *Calhoun v. Su-*

*perior Court* (1956) 46 Cal.2d 18 [291 P.2d 474], app. dism. 351 U.S. 960 [100 L.Ed. 1481, 76 S.Ct. 1029]; *People* v. *Sullivan* (1952) 113 Cal.App.2d 510 [248 P.2d 520], cert. den. 345 U.S. 995 [97 L.Ed. 1376, 73 S.Ct. 936]; *People* v. *Hardeman* (1966) 244 Cal.App.2d 1 [53 Cal.Rptr. 168].)

In *Lorenson*, a police captain and 12 other persons were indicted for conspiracy to commit robbery, to commit assault with a deadly weapon, and to pervert or obstruct justice or the due administration of the laws. In rejecting Lorensen's argument that Penal Code section 185, subdivision 5, was unconstitutionally vague, the court stated that "conduct which constitutes an offense against public justice, or the administration of law includes both malfeasance and nonfeasance by an officer in connection with the administration of his public duties, and also anything done by a person in hindering or obstructing an officer in the performance of his official obligations." (35 Cal.2d at p. 59.) Although that is just what Martin and Brown did here, Martin argues that *Lorenson* does not apply in this case. He first points to the following language from the court's opinion: "The meaning of the words 'to pervert or obstruct justice, or the due administration of the laws' is easily ascertained by reference either to the common law or to the more specific crimes enumerated in part I, title VII [of the Penal Code]." (35 Cal.2d at p. 59.) Martin interprets this language to mean that Penal Code section 182, subdivision 5, cannot be construed *without* reference to either the common law or to other "crimes against public justice" enumerated in title 7. That being the case, he argues, the statute is unconstitutionally vague when applied to him: no reference was made to any other title 7 crimes, and it is improper to look to the common law for the meaning of the statute, because statutory crimes have replaced common law crimes in California.

This argument is contrary to the holding in *Davis* v. *Superior Court* (1959) 175 Cal.App.2d 8 [345 P.2d 513], in which the court, interpreting *Lorenson*, stated: "The reference to 'Crimes Against Public Justice' does not necessarily exclude a crime not defined within the four corners of that Part I, title VII, of the Penal Code .... The [Lorenson] court's reference to such crimes was illustrative, rather than exclusionary." (175 Cal.App.2d at p. 16.) One illustration given by the *Davis* court is appropriate here: certain types of corrupt conduct by attorneys, constituting a perversion or obstruction of justice, were formerly set forth in title 7 of the Penal Code but are now contained in the Business and Professions Code under the State Bar Act. Such acts are no less an ob-

struction of justice simply because the statutes prohibiting them were moved from one code to another.

Martin relies primarily on *Musser* v. *Utah* (1948) 333 U.S. 95 [92 L.Ed. 562, 68 S.Ct. 397]. In *Musser*, which preceded *Lorenson*, the United States Supreme Court struck down as unconstitutionally vague a Utah law which prohibited conspiracy "to commit acts injurious to public morals." The "injurious" acts in *Musser* consisted of counseling, advising and urging other persons to practice polygamy. Thus, *Musser* is distinguishable on its facts.

Moreover, although the *Lorenson* court did not cite *Musser*, later cases have done so and held *Lorenson* to be binding. (*Calhoun* v. *Superior Court* (1956) 46 Cal.2d 18 [291 P.2d 474]; *People* v. *Sullivan* (1952) 113 Cal.App.2d 510 [248 P.2d 520].) Thus, Martin's reliance on *Musser* is clearly misplaced.

*2. There is insufficient evidence to establish that Martin is guilty of conspiracy to obstruct justice.*

■ The basic principles which govern judicial review of a criminal conviction challenged as lacking evidentiary support require the court to review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial, reasonable and credible evidence, of solid value, such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) While conceding that the "substantial evidence" standard makes the success of his argument unlikely, Martin contends that the judgment must be reversed for insufficient evidence because (a) the elements of conspiracy were not established, and (b) the evidence in this case was almost entirely circumstantial, and there exists a more plausible inference that Martin was not involved in the conspiracy.

■ Martin recites the elements of conspiracy as "agreement, specific intent, two or more persons, unlawful end or means, and overt act." (1 Witkin, Cal. Crimes (1963) p. 99.) Under Martin's analysis, the elements of the crime were not proved because (a) there was no evidence of an agreement, other than mere association; (b) no unlawful motive or intent was shown; and (c) the alleged "unlawful end" was the disposition of cases without the district attorney, which is not only *not* unlawful, but common.

Martin's analysis is flawed in several respects. First of all, the "evidence of an agreement" was a finding of fact made by the trial court; even though Martin claims his only relationship with Brown was "mere association," the trial court found otherwise, and the court's finding is supported by substantial evidence.

Secondly, Martin misstates the "intent" required to prove conspiracy. ■ Conspiracy is a specific intent crime, with the intent divided into two elements: the intent to agree or conspire, and the intent to commit the offense which is the object of the conspiracy. (*People v. Backus* (1979) 23 Cal.3d 360, 390 [152 Cal.Rptr. 710, 590 P.2d 837].) When the offense is conspiracy to obstruct justice, as described in Penal Code section 182, subdivision 5, it is unnecessary to demonstrate an intent to "obstruct justice" as such; it is sufficient that the evidence shows an intent to do the acts constituting the elements of an obstruction of justice as they are described in the charging allegations of the accusatory pleading. (*Ibid.*) Contrary to Martin's contention, a showing of an "evil or corrupt motive" is not required. (*People v. Saugstad* (1962) 203 Cal.App.2d 536, 542 [21 Cal.Rptr. 740].) ■ Thus, it is irrelevant that no evidence was offered to show that Martin received "money, favors or *anything*" from Brown in return for disposing of Brown's cases in the manner alleged. The court's finding, also supported by substantial evidence, was that Martin and Brown intended to do the acts which the indictment alleged were acts in furtherance of the conspiracy. The "unlawful end" which was alleged and proved was that the cases were disposed of not only without the presence of a deputy district attorney, but without the *consent or knowledge* of the district attorney's office.

The fact that the evidence of the conspiracy was circumstantial does not make that evidence any less persuasive or meritorious.

The evidence showed that Martin and Brown met often in Martin's chambers, with Brown entering either via the courtroom, admitted by Matt Kapp, or through the back door hallway. After these meetings, either Martin or Brown would instruct Kapp about the disposition in a given case. The dispositions in Brown's cases were contrary to Martin's established practices and contrary to the established policies of the district attorney's office. During the final two days of Martin's tenure, he was striking priors and guilty pleas at a feverish pace. Martin said that he was unaware of many of the dispositions, but admitted that he had

approved all of the 85 docket sheets in question.[3] Furthermore, reversal is not warranted simply because these facts are reasonably reconcilable with Martin's innocence. (*People v. Hardeman, supra*, 244 Cal.App.2d at p. 68.) The question is, are the facts also reconcilable with his guilt? The trial court determined that they were. The inference drawn by the trial court is a reasonable one, supported by substantial evidence, and the court's finding must be upheld. (*People v. Johnson, supra*, 26 Cal.3d 557.)

### 3. *Martin was entitled to a postindictment preliminary hearing.*

In *Hawkins v. Superior Court* (1978) 22 Cal.3d 584 [150 Cal.Rptr. 435, 586 P.2d 916], the California Supreme Court changed prior law and held that persons who are indicted by the grand jury are constitutionally entitled to a postindictment preliminary hearing. This requirement was made prospective to apply only to cases in which a plea had been entered after the date that *Hawkins* became final.

■ The *Hawkins* decision was filed on November 9, 1978, and became final on December 9, 1978. On November 29, 1978, Martin was arraigned and refused to plead, so the court entered a not guilty plea on his behalf. (Pen. Code, § 1024.)[4] On these facts alone, *Hawkins* would clearly not apply to Martin. However, Martin argues this court should adopt "a form of limited retroactivity" because of the "unique facts" of this case. According to Martin, those facts are as follows:

It is obvious that all parties were aware of the *Hawkins* decision at the time of the arraignment hearing. Martin had filed a demurrer and motion to strike, which the court had not yet fully reviewed, and the defense attorneys asked for a continuance. The prosecutor accused the defense of filing a "frivolous" demurrer in order to stall until *Hawkins* became final, and the defense accused the prosecutor of attempting to compel a plea in order to circumvent the effect of *Hawkins*. The court denied the motion for a continuance, entered a plea on behalf of each

---

[3]The trial court took judicial notice of Martin's motion to set aside the indictment under Penal Code section 995, which contained the following admission by Martin: "Everything in the dockets in evidence in this case were approved by the Court to be in them, and they are the official version .... There are no insertions in the dockets which were unknown to or unapproved by the court while acting in its official capacity."

[4]Section 1024 provides: "If the defendant refuses to answer the accusatory pleading, by demurrer or plea, a plea of not guilty must be entered."

defendant, and reserved jurisdiction to rule on Martin's demurrer. (The demurrer was overruled on Dec. 13, 1978.)

Martin concedes that the decision whether or not to grant a continuance is largely discretionary with the trial court. The fact that the court's refusal to grant a continuance thwarted Martin's attempt to take advantage of *Hawkins* does not mean that the court abused its discretion. Since *Hawkins*, the courts (including the Supreme Ct. itself) have rejected similar arguments (*People v. Teron* (1979) 23 Cal.3d 103, 112, fn. 3 [151 Cal.Rptr. 633, 588 P.2d 773]; *Sherwood v. Superior Court* (1979) 24 Cal.3d 183, 186 [154 Cal.Rptr. 917, 593 P.2d 862]; *People v. Madden* (1981) 116 Cal.App.3d 212 [171 Cal.Rptr. 897]; *People v. Pangelina* (1981) 117 Cal.App.3d 414, 417 [172 Cal.Rptr. 661]), and the facts of this case do not justify a different result here.

4. *The trial court erred in sentencing appellant to state prison.*

A violation of Penal Code section 182, subdivision 5, is punishable by "imprisonment in the county jail for not more than one year, or in the state prison, or by a fine not exceeding five thousand dollars ($5,000) or both." In this case, the court sentenced both appellants to state prison, a sentence which Martin contends is too harsh.

First, argues Martin, at common law the crime of conspiracy to obstruct justice was a misdemeanor, which the court has "bootstrapped" into a felony by imposing this particular sentence. However, since the sentence is provided by statute, and clearly a matter for the court's discretion, the fact that conspiracy was a misdemeanor at common law has no bearing here.[5] It was the Legislature, not the trial court, which made this violation a felony.

Next, argues Martin, the harsh sentence resulted from the trial court's prejudice against him, or at least against the crime he committed. The court's comments to which Martin points as evidence of this prejudice are:

"I think this is the most uncomfortable case that I have ever tried.

"Fundamentally, [this crime] is really unforgiveable.

---

[5]As Martin himself pointed out, statutory crimes have replaced common law crimes in California. (See argument 1, *ante*.)

"Judge Martin prostituted his robe. Mr. Brown prostituted his profession."[6]

Martin claims that "[b]ecause of his indignation and anger that appellant had sullied an honorable profession, Judge Ringer was led to the error of sentencing far too harshly."

Furthermore, Martin says "the sentence seems unduly harsh when compared to sentences which other judges have received." In the only other case in which a judge has been convicted of conspiracy to obstruct justice (*People* v. *Hardeman* (1966) 244 Cal.App.2d 1 [53 Cal.Rptr. 168], cert. den. 387 U.S. 912 [18 L.Ed.2d 634, 87 S.Ct. 1700]), the judge received a suspended sentence, and the usual punishment for wilful misconduct in office by a judge is removal from office or censure. (*In re Stevens* (1982) 31 Cal.3d 403 [183 Cal.Rptr. 48, 645 P.2d 99]; *Cannon* v. *Commission on Judicial Qualifications* (1975) 14 Cal.3d 678 [122 Cal.Rptr. 778, 537 P.2d 898]; *Spruance* v. *Commission on Judicial Qualifications* (1975) 13 Cal.3d 778 [119 Cal.Rptr. 841, 523 P.2d 1209]; *Geiler* v. *Commission on Judicial Qualifications* (1973) 10 Cal.3d 270 [110 Cal.Rptr. 201, 515 P.2d 1].)

Of course, by the time Martin was convicted, removal or censure was not an option, since Martin was retired before the indictment was even filed, and removal or censure were not within the trial court's power in any case.

Further, the fact that the court selected one of the sentences provided in section 182 does not mean that the court was prejudiced against Martin; the court was simply exercising the discretion granted to it under the statute. In fact, the sentence selected by the court was not the harshest it could have selected, since the court had the option of imposing a state prison sentence *and* a $5,000 fine.

What Martin is really saying is that he should be treated more favorably because he was a judge. It was apparently the trial court's opinion that judges and attorneys should be punished like everyone else when they commit felonies. The sentence imposed in this case was one of the sentencing choices provided by statute and was not improper.

---

[6]Martin also remarked that the court referred to the evidence as "a bag of fleas." Martin misquotes the court. Actually, Judge Ringer referred to the Citrus Municipal Court as "a bag of sleaze."

## Appellant Brown's Contentions

█ Brown's only contention on appeal rests upon the argument that he basically did nothing wrong. This argument is briefly summarized as follows:

A judge may do anything short of ignoring statutes, violating accepted practice, or accepting a bribe and be immune from criminal prosecution. As stated by Brown: "A judge is law unto himself in so far as the formality or lack of it with which he will enter a judgment, and indeed in so far as he will interpret statutes, follow precedent, or perform any other judicial function. In the absence of judicial corruption, which the statutes limit to bribery, a court has total immunity in carrying out its judicial duties. The only check upon it is removal from office when it fails to fulfill its duties in a manner which the Judicial Council deems proper. Short of accepting a bribe, a court, so long as it sits, can dispense the law or dispense with the law, and cannot be held to answer for its judgment or practice."

One of the things which judges are permitted to do is to be persuaded by lawyers, as lawyers are permitted to persuade judges. As stated by Brown: "He [Martin] may have been persuaded by lies and charm. He may have been persuaded by his own laziness and his confidence in the legal knowledge of the attorney who did the persuading." So long as Martin was not persuaded by bribery, says Brown, his actions are not criminal, and they cannot be made criminal by resort to the criminal conspiracy statute. Since Martin's actions were not criminal, and Brown's were (by his own admission) merely unethical, there can be no conspiracy.

Brown's argument is easily answered by *Lorenson, supra*, 35 Cal.2d 49, 59, and in other cases construing the meaning of "conspiracy to obstruct justice" as defined in section 182. The *Lorenson* court said that "obstruction, of justice" was "anything done by a person in hindering or obstructing an officer in the performance of his official obligations." This includes what Brown characterizes the art of persuasion, at least as practiced by him.

As for the actions of Judge Martin, the trial court correctly determined that they amounted to obstruction of justice within the meaning of section 182. In the trial court's words, "We have an entire series of cases where without the concurrence or knowledge or consent or the op-

portunity to present evidence, or the opportunity to say, 'No, I won't go along with that,' or the opportunity to just bitch and moan, cases are reduced, priors are stricken.

"And in the last two days of the Martin regime, with fantastic boldness.

"Mr. Brown and Judge Martin walked into chambers through the common hallway with the bailiff, and all of a sudden start dismissing cases.

"Now, I can't give you a comprehensive definition of what an obstruction of justice is. At the minimum, it is and includes the deliberate, systematic exclusion of one party to the criminal justice system of participating, if he wishes, in decision making."

The trial court found that this "deliberate, systematic exclusion" was the result of an agreement between Martin and Brown. Under *Lorenson* and cases which followed, this is a conspiracy to obstruct justice, despite Brown's argument to the contrary.

The judgments of conviction are affirmed.

Feinerman, P. J., and Ashby, J., concurred.

Petitions for a rehearing were denied October 13, 1982, and appellants' petitions for a hearing by the Supreme Court were denied November 10, 1982. Newman, J., and Kaus, J., did not participate therein.