[No. G043395. Fourth Dist., Div. Three. Dec. 21, 2010.]

JAMES FLEMING, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

[No. G043577. Fourth Dist., Div. Three. Dec. 21, 2010.]

THE PEOPLE, Plaintiff and Appellant, v.
JAMES FLEMING et al., Defendants and Respondents.

**COUNSEL**

Law Office of John D. Barnett, John D. Barnett and Albert A. Newton for Petitioner and for Defendant and Respondent James Fleming.

No appearance for Respondent.

Tony Rackauckas, District Attorney, and Stephan Sauer, Deputy District Attorney, for Real Party in Interest and for Plaintiff and Appellant.

Law Office of Kevin E. Gallagher and Kevin E. Gallagher for Defendant and Respondent Susan McGill.

**OPINION**

**SILLS, P. J.—**

## I. INTRODUCTION

Penal Code section 424 provides that each officer of any school district in this state who is charged with the "receipt, safekeeping, transfer, or disbursement of public moneys," and who, *without authority of law*, appropriates such moneys to his or her own use, may be punished by a prison term of two, three or four years.[1] In this case, criminal charges have been brought via a grand jury indictment against the former superintendent of the Capistrano Unified School District (the District), petitioner James Fleming, for authorizing subordinates to compile two lists of individuals who strongly supported a recall of the District's school board back in 2005.

In response to the superintendent's petition for writ of mandate attacking the indictment, this court issued an order to show cause and scheduled oral argument in order to consider the legal question of whether the superintendent's authorization fell within the purview of his lawful duties as District superintendent. In sum, we now hold that because Fleming was within his lawful authority to authorize his subordinates to compile the two lists, his authorizations were not criminal under section 424. Briefly, Fleming was within the proper scope of his authority as superintendant to research the nature of the discontent and unrest in the District at the time. (See *Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424, 1431 [57 Cal.Rptr.3d 885] (*Morrow*) [school superintendent "had an official duty to communicate with the press about matters of public concern" and what district would do about incidents of student violence].)

We also consider the district attorney's office's own appeal from the trial court's dismissal of two other counts against Fleming. One of those counts is based on an allegedly criminal violation of Education Code section 7054; the other is based on a conspiracy with his assistant superintendent to, in the language of Penal Code section 182, subdivision (a)(5), "commit any act . . . to pervert or obstruct justice, or the due administration of the laws." The case against Fleming based on Education Code section 7054 collapses in light of the fact that neither of the two lists, under California Supreme Court cases, comes anywhere near to constituting the "urging support or defeat" of a

---

[1] Any further undesignated references to "section 424" are to the Penal Code.

candidate or ballot measure as is required for violation of that statute. And the conspiracy allegation under Penal Code section 182, subdivision (a)(5) fails because Fleming and his assistant superintendent agreed to do nothing more than acts which (1) they had the legal right to do in the first place, (2) they had no criminal objective in doing, and (3) did not come anywhere near to obstructing justice or the due administration of law in the first place.

## II. BACKGROUND

### A. *The First List*

It would be safe to say that in the spring of 2005 there was a fair amount of discontent among many parents and citizens in the District. One sore point that received media attention was a new District headquarters building, often referred to as the "Taj Mahal." As recall supporters saw it, District bureaucrats got an expensive new building while students continued to make do with portable classrooms.[2] But there were other issues too, such as the location of a new high school and new attendance boundaries.

And so, in the spring of 2005, an e-mail was brought to the attention of the District's superintendant, James Fleming. The e-mail had the subject line "Let's show up for the Recall" and it had a large list of e-mail addresses in the "to" column.[3] Some of the addresses, of course, were of simple names, and others were obviously aliases. According to Fleming, he wanted to know the degree of dissatisfaction with the location of a new high school (he would refer to opponents of that location as "Nimbys"[4]), and with recent changes in school attendance boundaries. Fleming would later say that he wanted to "inform" these nascent recall supporters of the reasons for the location of the new high school and the recent changes in attendance boundaries. One of his

---

[2] (See, e.g., Izumi, *California's Affluent Schools Ooze Corruption* (Jan. 8, 2008) Human Events <http://www.humanevents.com/article.php?id=24323> [as of Dec. 21, 2010] ["The Capistrano debacle started with discontent among parents over the skyrocketing cost of a planned district headquarters building. A local newspaper estimated the price tag at $52 million, double the original official estimate. Anger over this spending fiasco triggered a parent-supported recall campaign against school board members who backed the bureaucrats' Taj Mahal."].)

[3] According to the district attorney's office, the e-mail, sent to recall supporters, was then forwarded to the principal of a District school (Jim Seiger), who in turn forwarded a copy to superintendent Fleming.

[4] An acronym for "not in my backyard." It was used for the first time in a published California opinion in *Hoffmaster v. City of San Diego* (1997) 55 Cal.App.4th 1098 [64 Cal.Rptr.2d 684], and generally refers to someone opposed to some nearby (hence "backyard") development.

staffers, Kate McIntyre, testified before the grand jury that the list was developed so that people who were unhappy with the District could be "educated" about District issues.

We stress that in this opinion we accept the district attorney's office's version of the facts, i.e., the version of the facts most disfavorable to Fleming. Under this version of the facts, he directly asked his assistant superintendant or a secretary to compile a list of the names from the addressees of the e-mail proposing the recall. That person in turn developed a series of spreadsheets that converted the "to" addresses in the original e-mail into a spreadsheet that had columns of the real people's names. Next to the names were corresponding e-mail addresses. Then, in the same line (but only in some cases), names of the relevant high school, middle school and elementary school attendance area. The spreadsheets could not have been compiled without access to a student information database system known as Aeries.

In any event, the actual work involved on this list was minimal: The secretary who did the typing testified that the preparation of the spreadsheets would have taken no more than a half hour.

We have no evidence that Fleming actually *did* anything with this first list, other than to "maintain" it over the course of the ensuing months.

## B. *The Second List*

The recall effort failed in December 2005, and, as noted, there is no evidence that the failure could be in any way tied to the first list because Fleming (literally) did nothing with it. The reason for the failure was, however, *not* any general lack of support for the recall, but because supporters were in too much of a hurry and thus ran afoul of election law. As explained in *Capo for Better Representation v. Kelley* (2008) 158 Cal.App.4th 1455 [71 Cal.Rptr.3d 354] (*Capo for Better Representation*), recall petition circulators were so eager to recall the entire seven-person board of the District that they literally filled in the signers' addresses for them after each signer signed the first recall form, so as to avoid troubling signers with the task of making them write in their addresses on the six additional recall forms. That "shortcut," however, violated the Elections Code. (*Id.* at pp. 1459–1460.)

While Fleming would later deny authorizing the second list, the prosecution's case is that he sent his assistant superintendent, Susan McGill, and the District communications director, David Smollar, to the office of the county registrar of voters, during regular school hours in the period January 1 through January 12, 2006, to view the actual petitions that had been turned in.[5] Registrar Neal Kelly then (improperly, as everyone now seems to acknowledge) allowed McGill and Smollar to view the actual petitions and copy down names of recall petition circulators.[6] McGill, in turn, instructed her secretary Barbara Thacker to create a spreadsheet of these signature gatherers using information from the Aeries database. Thacker created two new lists: One of the hardcore gatherers who were responsible for 90 percent of the signatures, the other for the rest. McGill then sent Fleming a cover sheet for the lists with the words, "Per your request, attached are the lists of individuals who were listed as petition signature-gatherers along with the information on whether they have children in CUSD and which schools those children attend."[7]

## C. *And the Subsequent Indictment*

Word of the two lists eventually leaked out[8] and the district attorney's office initiated grand jury proceedings. The grand jury returned an indictment in May 2007 against Fleming and McGill. The indictment sets forth three counts against Fleming, all centering on misuse of public funds, with the fourth against McGill, for perjury based on allegedly false statements made to the grand jury. (We deal with the fourth count against McGill in a separate opinion.)

---

[5] There is considerable evidence in the grand jury transcript that the second list was never Fleming's idea at all; rather, it was Smollar's, who unilaterally undertook the task of writing down names of recall supporters from the petitions he saw at the registrar's office. However, as noted above, in this opinion we accept the prosecution's factual theory that Fleming himself was the one who had the idea of sending his assistant superintendent and Smollar down to the registrar's office with the specific purpose of compiling a list of supporters.

[6] Smollar plays a more prominent role in the companion prosecution of McGill for perjury, which centers on her (allegedly false) statements under oath to the grand jury that she did not do any copying or send any memo about the list to Fleming.

[7] Again, that is the version of events we accept for this case. We do note, though, that in the companion prosecution against McGill for perjury, the issue of whether McGill ever instructed her secretary to prepare the second list in the first place—or ever wrote the cover sheet to which the list was apparently attached—is a matter of factual dispute.

[8] The two lists would subsequently be commonly referred to in the media as "enemies lists." We will not refer to them as such, because to do so would be to accept the premise that they were developed to somehow punish or attack recall proponents. The lists are what they are. They do not have a heading saying "enemies list," and thus we will describe them simply as "lists."

As a technical matter more relevant to the companion case involving McGill than this one, we also note that the second list came into the possession of the prosecution after the first one.

The three counts against Fleming are:

—Count 1 for violation of section 424 based on the willful and unlawful appropriation of public moneys for his own use in ordering the creation of the two lists.

—Count 2 for violation of Education Code section 7054 based on the use of District funds to urge support or defeat of a ballot measure (i.e., the recall of the District's board). Count 2 is based exclusively on the first list.

—Count 3 for *conspiracy*, along with his assistant superintendent McGill, to violate Education Code section 49076 based on the use of the Aeries computer program with its confidential information about pupil records, plus conspiracy to commit acts "injurious to the public" by creating the two lists.

### D. *The Litigation*

In October 2009, Fleming brought a motion, pursuant to section 995 of the Penal Code,[9] to set aside the indictment as without probable cause. At a hearing in late February 2010, the trial court *granted* the motion as regards counts 2 and 3, finding that there was no evidence that Fleming ever "urged the resistance" to the recall effort or "attempted to persuade or influence any vote in that aborted recall."

Count 1, however, was not dismissed because, in Judge Froeberg's words, Fleming had used "company time to investigate political things." On March 15, 2010, Fleming filed a writ petition (G043395) to reverse the order as to count 1. Two weeks later, on March 29, the Orange County District Attorney's Office filed a writ petition (*People v. Superior Court* (*Fleming*) (June 3, 2010, G043464)) to overturn the order as to counts 2 and 3. This court denied that petition, but scheduled an order to show cause as to Fleming's challenge to count 1.

Meanwhile, the district attorney's office filed an appeal from the trial court's order dismissing counts 2 and 3. This court then consolidated Fleming's writ proceeding on count 1 with the appeal on counts 2 and 3.

### III. DISCUSSION

This combined writ proceeding and appeal focus on the proper interpretation of three statutes. The first is section 424, which deals with misappropriation of public funds generally. The second is Education Code section 7054,

---

[9] All further undesignated references to "section 995" will be to the Penal Code. Section 995, subdivision (a) provides that indictments "shall be set aside by the court in which the defendant is arraigned" when the indictment is "without reasonable or probable cause."

which is a much more focused statute, prohibiting the use of *school* funds for political campaign purposes. The third is Penal Code section 182, subdivision (a)(5), which is part of the Penal Code addressing conspiracies, and which makes any conspiracy to "commit an act . . . to pervert or obstruct justice, or the due administration of the laws" illegal.[10]

■ A few points of comparison among the statutes should be noted at the outset. First, as we mentioned earlier, section 424 requires that, to be unlawful, the misappropriation must be made "Without authority of law." The exact language, from subdivision (a) of the statute is: "Each officer of this state, or any county, city, town, or district of this state, and every other person charged with the receipt, safekeeping, transfer, or disbursement of public moneys, who either: [¶] 1. *Without authority of law*, appropriates the same, or any portion thereof, to his or her own use, or to the use of another . . . [¶] . . . [¶] [i]s punishable by imprisonment in the state prison for two, three, or four years, and is disqualified from holding any office in this state." (Italics added.)

One should note that, under the actual language of the statute, an officer's appropriation to his or her "own use" or "use of another" *is* lawful *if* done *with* "authority of law." To mention two obvious and noncontroversial examples: a football coach's requisition of sleds for the high school football team, or a history teacher's requisition of legal pads to make notes for lectures.

It is also worth noting that the statute contains an explicit "incidental and minimal use of public resources" exception. The exact language, from subdivision (c) of section 424, is: "This section does not apply to the incidental and minimal use of public resources authorized by Section 8314 of the Government Code."

■ Second, Education Code section 7054, unlike Penal Code section 424, does *not* make the absence of "authority of law" an element of the crime. Nor does Education Code section 7054, in contrast to Penal Code section 424, set forth an "incidental and minimal use" exception. However, the crime delineated in section 7054 is itself defined much more narrowly. The crime is the specific *use* of school moneys for the specific purpose of "urging the support or defeat" of a ballot measure. (Ed. Code, § 7054.) The exact language, from subdivision (a) of the statute, is: "No school district or community college

---

[10] Any further undesignated reference to "section 182" will be to the Penal Code; any further undesignated reference to "section 7054" will be to the Education Code.

district funds, services, supplies, or equipment *shall be used for the purpose of urging the support or defeat of any ballot measure or candidate*, including, but not limited to, any candidate for election to the governing board of the district." (Italics added.)

Given its school-specific and election-specific focus, it is perhaps to be expected that—at least up to now—there has been no appellate case, published or unpublished, where an alleged violation of section 7054 was the basis for a criminal prosecution, though the statute certainly does provide for criminal penalties.

Third, the language used in section 182, subdivision (a)(5) is extremely broad. Here it is: "If two or more persons conspire: [¶] . . . [¶] (5) To commit any act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due administration of the laws. [¶] . . . [¶] They are punishable as follows: . . . ." The district attorney's office correctly notes that, as a matter of *statutory* construction, the literal language of section 182 would allow for the prosecution of conspiracies to do legal acts, if only because another part of the statute, subdivision (a)(1), makes conspiring to commit any crime itself a crime. (The language from that other part: "If two or more persons conspire: [¶] (1) To commit any crime. [¶] . . . [¶] They are punishable as follows: . . . .") That is, to avoid redundancy (conspiracies to commit crimes are already illegal), the language of the statute allows for conspiracies to do acts which are not illegal.

■ However, the California Supreme Court has held: "The meaning of the words 'to pervert or obstruct justice, or the due administration of the laws' is *easily ascertained by reference either to the common law or to the more specific crimes enumerated* in part I, title VII." (*Lorenson v. Superior Court* (1950) 35 Cal.2d 49, 59–60 [216 P.2d 859], italics added (*Lorenson*); accord, *Skilling v. United States* (2010) 561 U.S. ___, ___ [177 L.Ed.2d 619, 130 S.Ct. 2896, 2929] [limiting federal "honest-services" statute to actual bribery or kickback schemes to avoid unconstitutionality for vagueness].) Of course, a conspiracy to obstruct justice certainly qualifies as an illegal conspiracy.

With these general observations in mind, we now examine each of the three counts brought against Fleming.

## A. *Fleming's Writ Challenge to Count 1*

### 1. The Scope of a Superintendent's Lawful Authority

As noted, section 424 requires some sort of appropriation of public funds to the public official's own use "without authority of law."[11] The question thus arises as to whether Fleming's authorization of staff time to prepare the two lists was inside, or outside, of Fleming's lawful authority as District superintendent.

■ Education Code section 35035 delineates the powers and duties of school superintendents. Those powers and duties include *being* the CEO (chief executive officer) of the governing board of the district, preparing the budget, being responsible for the transfer of teachers within the district, and ascertaining proper certifications for the relevant district employees.[12]

Since superintendents are the CEO's of the governing boards of their districts, and since boards may delegate their powers *to* their superintendents,

---

[11] Here is the complete text of the statute:

"(a) Each officer of this state, or of any county, city, town, or district of this state, and every other person charged with the receipt, safekeeping, transfer, or disbursement of public moneys, who either:

"1. Without authority of law, appropriates the same, or any portion thereof, to his or her own use, or to the use of another; or,

"2. Loans the same or any portion thereof; makes any profit out of, or uses the same for any purpose not authorized by law; or,

"3. Knowingly keeps any false account, or makes any false entry or erasure in any account of or relating to the same; or,

"4. Fraudulently alters, falsifies, conceals, destroys, or obliterates any account; or,

"5. Willfully refuses or omits to pay over, on demand, any public moneys in his or her hands, upon the presentation of a draft, order, or warrant drawn upon these moneys by competent authority; or,

"6. Willfully omits to transfer the same, when transfer is required by law; or,

"7. Willfully omits or refuses to pay over to any officer or person authorized by law to receive the same, any money received by him or her under any duty imposed by law so to pay over the same;—

"Is punishable by imprisonment in the state prison for two, three, or four years, and is disqualified from holding any office in this state.

"(b) As used in this section, 'public moneys' includes the proceeds derived from the sale of bonds or other evidence or indebtedness authorized by the legislative body of any city, county, district, or public agency.

"(c) This section does not apply to the incidental and minimal use of public resources authorized by Section 8314 of the Government Code."

[12] Here is the complete text of the statute:

"The superintendent of each school district shall, in addition to other powers and duties granted to or imposed upon him or her:

"(a) Be the chief executive officer of the governing board of the district.

"(b) Except in a district where the governing board has appointed or designated an employee other than the superintendent, or a deputy, or assistant superintendent, to prepare and submit a

board powers are also relevant to the superintendent's duties. (See Ed. Code, § 35020 ["The governing board of each district shall fix and prescribe the duties to be performed by all persons in public school service in the school district."].) Most significant to this case is Education Code section 35172, subdivision (a), which gives governing boards explicit authority to "*Conduct studies through research and investigation* as are determined by it to be required in connection with *the present and future management, conditions, needs,* and financial support *of the schools*; or join with other school district governing boards in the conduct of such studies." (Italics added.) And in that regard, section 42130 of the Education Code requires school superintendents to submit two semiannual reports to the governing board of each district on the financial and budgetary status of the district.

Additionally, Education Code section 35172, subdivision (c) provides that the governing board may "Inform and make known to the citizens of the district, the educational programs and activities of the schools therein."

Boards of education are also under a statutory duty to try to keep all the schools in their districts as equal as possible: "The governing board of any school district shall maintain all of the elementary day schools established by it, and all of the day high schools established by it with equal rights and privileges as far as possible." (Ed. Code, § 35293.) Thus, it is surely within the legitimate purview of a district superintendent to investigate whether any discontent in a district is limited to particular schools or whether it is evenly spread throughout a district.

*Morrow, supra,* 149 Cal.App.4th 1424 is illustrative of the informational duties of superintendents. The case centered on the alleged defamation of a high school principal by a district superintendent. In statements made to the

---

budget, prepare and submit to the governing board of the district, at the time it may direct, the budget of the district for the next ensuing school year, and revise and take other action in connection with the budget as the board may desire.

"(c) Subject to the approval of the governing board, assign all employees of the district employed in positions requiring certification qualifications, to the positions in which they are to serve. This power to assign includes the power to transfer a teacher from one school to another school at which the teacher is certificated to serve within the district when the superintendent concludes that the transfer is in the best interest of the district.

"(d) Upon adoption, by the district board, of a district policy concerning transfers of teachers from one school to another school within the district, have authority to transfer teachers consistent with that policy.

"(e) Determine that each employee of the district in a position requiring certification qualifications has a valid certificated document registered as required by law authorizing him or her to serve in the position to which he or she is assigned.

"(f) Enter into contracts for and on behalf of the district pursuant to Section 17604.

"(g) Submit financial and budgetary reports to the governing board as required by Section 42130."

Los Angeles Times, the superintendent said the principal should have shown " 'stronger leadership' " in the wake of violence at the school. The Court of Appeal got the case when the principal's suit was dismissed under the anti-SLAPP (strategic lawsuit against public participation) statute. In the course of upholding the dismissal of the suit against the superintendent, the *Morrow* court said that the statements were not "unrelated to a legitimate policymaking function" of the superintendent; indeed, one of his official duties was to publicly explain the district's response to the spate of violence at the principal's high school. (*Id.* at pp. 1442–1443; see also *id.* at p. 1431 [noting superintendent's argument 'that he had "an official duty to communicate with the press about matters of public concern"].)

## 2. Application

In the instant case, Fleming, as superintendent, had a legitimate interest in ascertaining if there was a *pattern* to the discontent represented by the "nascent" recall movement. A comparison of school attendance zones with recall leadership would show if the discontent was correlated with areas in the District affected by recent attendance boundary changes, or the controversial location of the new high school. Studying geographical and school attendance zone discrepancies among recall supporters was also relevant (as we allude to above) to the possibility that the constituencies of *some* school attendance areas in the District might have been more dissatisfied than others. And, as a matter of empirical research, the lists could reveal whether the discontent that generated the recall was statistically associated with Fleming's policies *qua* his stewardship as CEO generally, or localized to particular pockets within the District.

Moreover, the lists could serve the valuable and lawful purpose of allowing superintendent Fleming to actually meet with his critics, learn their grievances, and explain his position to them. After all, we may ask, since when is it criminal for a school superintendent to meet with his critics?

Interestingly enough, on this very point, the district attorney's office has advanced contradictory positions. At the trial level, the trial deputy handling Fleming's case told the trial court that the compilation of the lists so that Fleming might meet with his critics and explain his positions to them was *itself* the illegal "own use" to which he had put public resources. As part of his initial set of comments to the trial judge, the prosecutor said: "Was there ever an urging in the sense of the word? Was any voter or any person who has influence ever urged not to support the recall? Perhaps not. But what was

the purpose of it? The purpose was to eventually have sway—to kill the recall, if they could, which it was killed. So the evidence supports that."[13]

A few moments later, the trial judge asked: "Where is the evidence, then, that this information was gathered to try to influence the election?"

To that question the trial prosecutor replied, "Well, the evidence comes from Ms. McIntyre [(Fleming's secretary)] that they were gathering this information so *they could go and influence the recall proponents themselves.*" (Italics added.)

At oral argument in this appellate court, however, the appellate deputy handling the writ and appeal (rather sensibly) appeared to concede the commonsense proposition that the superintendent had every legal right to meet with his critics. Here is the colloquy that took place in this court:

Justice Rylaarsdam: "He was conducting his investigation in order to determine what—who was dissatisfied with the services offered by the school, by the services offered by the school administration, so that he could remedy that situation; if that was his purpose it would be okay, right?"

Appellate deputy: "If that were the purpose."

As shown by the *Morrow* case, and for that matter by the petition clause of the First Amendment, Fleming would have been perfectly within his lawful authority as superintendent to have used the lists to actually contact recall proponents and ask them to meet with him so he could learn firsthand what their grievances were. But how else, after all, could that be done unless Fleming first had a list of people who had grievances? (And correlating those people with any children they might have in any specific school would at least give Fleming some indication as to whether any grievances were specific to a certain school or area of the District.) Fleming meeting with his critics would be no more a personal appropriation of public resources than the superintendent in *Morrow* explaining the problems with violence at a particular high school.

The district attorney's office has two responses to the idea that Fleming had legitimate, lawful reasons to order the lists compiled—one very specific, one more general.

---

[13] As we have noted above, the fact that the recall was, to use the trial deputy's word, "killed," was *not* the result of any lack of support for the recall. The problem was that recall petition-gatherers filled in the addresses of petition-signers instead of taking the time to have the petition-signers fill in their addresses on all seven sets of recall petitions.

The specific response is to point to the grand jury testimony of Marlene Draper, president of the school board, who testified before the grand jury that she told Fleming that the recall was a board issue and Fleming should not let district staff get involved. (Draper also testified, albeit with the benefit of hindsight, that compiling any list of recall proponents would be against her policy.)

But Draper's cautioning of Fleming not to get involved in "the recall" does not establish that Fleming was not within his lawful authority to research the possibility of some geographic pattern in the recall movement, or even meet with recall supporters for an exchange of views. Fleming could readily interpret "the recall" to mean the process of gathering petitions, or any subsequent election. It would not necessarily mean not meeting with people who were obviously dissatisfied in some way with him and the District.

The appellate deputy, in this regard, said something very revealing at oral argument about the premises underlying the prosecution's legal theory. He said, just a few moments before the colloquy quoted above, that "Under 424, the purpose has to be enumerated; in other words, you are not allowed to do something using government funds unless it's spelled out."

■ The appellate deputy's statement suggests an interpretation of section 424 that the statute's actual text does not support. The statute does not make criminal an appropriation of public funds that is not specifically "spelled out." The words it uses are: "Without lawful authority." Those words convey a considerably broader (and more workable) concept than "spelled out."

We have already noted the relatively broad authority of district superintendents given them by the Legislature. They *are* the "CEO's" of their districts. They may conduct "research and investigation" into the "present management" and "conditions" of their districts. Research and investigation surely includes the compiling of data that might shed light on patterns of dissatisfaction within a district.

The more general response of the district attorney's office is premised on a reading of section 424 that never quite dares speak its name, so we will speak it now: It is the idea of a contaminating motivation. The idea is that even though a school official is *within* his or her "authority of law" to do a given act using public resources, if there is some wrongful motivation for the act—even if there is a good motivation as well—the act is criminal.

■ There are several reasons why this postulated reading of section 424 is incorrect. First and foremost, it inserts something into the words that the Legislature wrote that isn't there: The idea of motivation. Section 424 says

nothing about motivation. The linchpin is whether there is "authority of law" for the appropriating act, or not. Let us quote the salient words of the statute again: "Each officer of . . . any . . . district of this state . . . who either: [¶] 1. Without authority of law, appropriates the same, or any portion thereof, to his or her own use . . . or [commits any of the other acts prohibited by the statute, which are not at issue in this case, is] punishable . . . ." The concept of a contaminating motivation simply isn't there. Code of Civil Procedure section 1858 states a general rule applicable to the interpretation of all statutes: "In the construction of a statute or instrument, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted . . . ."

The second reason the reading is incorrect is that it would readily devolve into absurdity. A dedicated public servant, trying to do a really good job while working for an elected boss, would be subject to criminal prosecution because *one* of his or her motivations for doing so—maybe even his or her sole motivation for doing so—might be to make the boss the look good so the boss would be reelected.

■ Finally, we reject the "contaminating motivation" theory of section 424 in the context of this case because such a reading generally clashes with the statutes in the Education Code that provide for a superintendent's lawful powers. To be the "CEO" of the governing board of the district and keep on top of conditions in the district and the management of the schools requires a reasonable amount of discretion. The model one derives from Education Code section 35035 is one of a fairly broad grant of authority with a few specific off-limits provisions. It is not a case where a superintendent must be afraid to act unless he has the most minute of authorizations.[14]

Here, Fleming was in charge of policy for the District, intimately involved in attendance and new school locations. Research and investigation into the question of whether District policy in those areas had generated such ill feeling that it sparked a recall was a legitimate concern within his discretion. The fact that a possible election might ultimately have been involved somewhere down the line does not obviate the *legitimacy* of the concern or area of investigation. Thus the district attorney's office's argument that the grand jury "saw things differently" in terms of Fleming's *subjective motive* is irrelevant to the question of whether Fleming had the *lawful authority to make the authorizations in the first place*. To repeat: The words of the statute itself are framed in terms of lawful authority, not motivation.

---

[14] For example, while Education Code section 35035 makes a superintendent "the chief executive officer of the governing board of the district," Education Code section 35036 then expressly limits a superintendent's ability to effectuate teacher transfers.

B. *The District Attorney's Office's Appeal on Count 2*

We now turn to the district attorney's office's appeal from the trial court's dismissal of count 2, which is the criminal charge for violation of section 7054.

1. General Considerations

Section 7054 is a short statute. As noted above, it leads off in subdivision (a) with a sentence the operative verb of which is "shall be used." (To quote it again: "No school district or community college district funds, services, supplies, or equipment *shall be used* for the purpose of urging the support or defeat of any ballot measure or candidate, including, but not limited to, any candidate for election to the governing board of the district." (Italics added.).)

█ But next, in subdivision (b), the statute hastens to explicitly exempt, from the ambit of the prohibition against *use* of district money, the *use* of public money to provide information about the effects of a ballot measure or bond issue if that use is otherwise authorized by law and constitutes a fair and impartial presentation. The exact text is: "Nothing in this section *shall prohibit the use* of any of the public resources described in subdivision (a) to provide information to the public about the possible effects of any bond issue or other ballot measure if both of the following conditions are met: [¶] (1) The informational activities are otherwise authorized by the Constitution or laws of this state. [¶] (2) The information provided constitutes a fair and impartial presentation of relevant facts to aid the electorate in reaching an informed judgment regarding the bond issue or ballot measure." (Italics added.)

The statute finishes up in subdivision (c) by specifying the penalties for its violation.

As noted, section 7054 has not (at least up to now) appeared in any decisions involving criminal prosecutions. In fact, though mentioned in passing in several cases, only one published opinion, *San Leandro Teachers Assn. v. Governing Bd. of San Leandro Unified School Dist.* (2009) 46 Cal.4th 822 [95 Cal.Rptr.3d 164, 209 P.3d 73] (*San Leandro*), has had occasion to directly construe the statute, and even then in a context somewhat different than the one before us now.

Despite the difference though, the decision in *San Leandro* is worth reviewing, if only as an introduction to our Supreme Court's public resource-electioneering jurisprudence. Just before a school board election, a teachers' union distributed two newsletters to the teacher and staff mailboxes at each

school in the district. One newsletter mentioned two union-endorsed candidates in the upcoming election while the second newsletter specifically urged recipients to " 'volunteer to phone or walk in support of our endorsed School Board Candidates.' " (*San Leandro, supra*, 46 Cal.4th at p. 829.) When district managers found out about it, however, the district prohibited any "materials that contain political endorsements" from any future distributions to the mailboxes. (*Ibid.*) The union then sued to overturn the district's new policy, but the Supreme Court ultimately upheld the policy because section 7054 did indeed "ban placing candidate endorsements in school mailboxes." (46 Cal.4th at p. 836.) It was pretty obvious that the statute's use of the word "equipment" could readily "encompass mailboxes specially constructed at taxpayer expense to serve as a school's internal communication channel, which one group may not use to its exclusive political advantage." (*Id.* at p. 835.)

However, in so construing section 7054, the court emphasized the "narrowness" of its holding. (*San Leandro, supra*, 46 Cal.4th at p. 837.) For one thing, the court said that a school district was not even "compelled to exclude candidate endorsements from school mailboxes" if done " 'on an equitable basis.' " (*Ibid.*, quoting Ed. Code, § 7058.) Moreover, the court's holding did not "extend to union literature" that merely urged members "to become involved in upcoming elections and inform[ed] them how to do so, or engage[d] in public policy discussion in more general terms." (46 Cal.4th at p. 837.)

But if section 7054 has only been the object of direct attention in one published decision, it is nevertheless part of a general body of law involving public expenditures in political contexts, and has been indirectly illuminated by two other decisions of the Supreme Court, *Vargas v. City of Salinas* (2009) 46 Cal.4th 1 [92 Cal.Rptr.3d 286, 205 P.3d 207] (*Vargas*) and *Stanson v. Mott* (1976) 17 Cal.3d 206 [130 Cal.Rptr. 697, 551 P.2d 1] (*Stanson*). Indeed, in *San Leandro*, the court observed that the 1995 amendments to section 7054 were made to "more expressly incorporate[] the principles set forth in *Stanson*." (*San Leandro, supra*, 46 Cal.4th at p. 833.)

Moreover, in structure, section 7054 is similar to two other statutes containing prohibitions on the use of public funds for electioneering, specifically, Government Code sections 8314 and 54964.[15] Section 54964, as well as the *Stanson* case itself, was considered by the Supreme Court in *Vargas*, while section 8314 was recently construed by the Court of Appeal in *DiQuisto v. County of Santa Clara* (2010) 181 Cal.App.4th 236 [104 Cal.Rptr.3d 93] (*DiQuisto*). Like section 7054, sections 8314 and 54964 both

---

[15] All further undesignated references to "section 8314" or "section 54964" are to the Government Code.

first set forth prohibitions on the use of public resources for campaign activity, but then make clear that the prohibitions do not extend to fair and impartial information dissemination otherwise authorized by law.[16]

*Stanson* is in some ways the fountainhead case in the area, since it is the lead case articulating the *constitutional* due process limits on the use of public funds for campaigning. Indeed, as recently noted in *Vargas*, the distinction between campaigning and impartial information dissemination finds its origins in *Stanson*. (See *Vargas, supra*, 46 Cal.4th at p. 7 ["In *Stanson* . . . we explained that because of potential constitutional questions that may be presented by a public entity's expenditure of public funds in connection with a ballot measure that is to be voted upon in an upcoming election, there is a need to distinguish between (1) 'campaign' materials and activities that presumptively may not be paid for by public funds, and (2) 'informational' material that ordinarily may be financed by public expenditures."].)

In specific terms, *Stanson* held that the director of a state department of parks and recreation could not authorize his department to spend $5,000 of public funds to promote the passage of a bond issue to acquire more

---

[16] Section 8314 provides in part:

"(a) It is unlawful for any elected state or local officer, including any state or local appointee, employee, or consultant, to use or permit others to use public resources for a campaign activity, or personal or other purposes which are not authorized by law. [¶] . . . [¶]

"(d) Nothing in this section shall prohibit the use of public resources for providing information to the public about the possible effects of any bond issue or other ballot measure on state activities, operations, or policies, provided that (1) the informational activities are otherwise authorized by the constitution or laws of this state, and (2) the information provided constitutes a fair and impartial presentation of relevant facts to aid the electorate in reaching an informed judgment regarding the bond issue or ballot measure."

Government Code section 54964 provides in part:

"(a) An officer, employee, or consultant of a local agency may not expend or authorize the expenditure of any of the funds of the local agency to support or oppose the approval or rejection of a ballot measure, or the election or defeat of a candidate, by the voters. [¶] . . . [¶]

"(c) This section does not prohibit the expenditure of local agency funds to provide information to the public about the possible effects of a ballot measure on the activities, operations, or policies of the local agency, if both of the following conditions are met:

"(1) The informational activities are not otherwise prohibited by the Constitution or laws of this state.

"(2) The information provided constitutes an accurate, fair, and impartial presentation of relevant facts to aid the voters in reaching an informed judgment regarding the ballot measure.

"(d) This section does not apply to the political activities of school officers and employees of a county superintendent of schools, an elementary, high, or unified school district, or a community college district that are regulated by Article 2 (commencing with Section 7050) of Chapter 1 of Part 5 of the Education Code."

parkland. The case came up to the Supreme Court on demurrer, and the key point was that the authorization was *promotional* rather than *informational*.[17]

More recently, in *Vargas*, the high court had occasion to apply *Stanson* in the context of certain expenditures by a city in the face of a ballot measure to cut a city utility users tax. Those expenditures by the city were: (1) a one-page flyer that described the ballot measure and identified the city services that would be eliminated or reduced if the measure passed; (2) a city-published quarterly newsletter that also, in several articles, identified various services and programs that would be cut if the measure were passed; and (3) maintenance of a city Web site that contained a report about all the cuts that would occur if the measure passed. (See *Vargas, supra*, 46 Cal.4th at pp. 11–13.)

As the *Vargas* court explained, these particular activities were *not* "improper campaign materials or activities under the standard set forth in *Stanson*" because they really weren't *campaign* materials such as "bumper stickers, mass media advertisement spots, billboards, door-to-door canvassing, or the like." (*Vargas, supra*, 46 Cal.4th at pp. 9, 8.)

On the other hand, the *Vargas* court also reigned in an "express advocacy" standard which the intermediate appellate court had used, relying on section 54964, to justify the expenditures. "Nothing" in that statute, said the court, actually *granted* authority to the city "to pay for communications or activities that constitute campaign activities under *Stanson* . . . so long as such communications do not 'expressly advocate' the approval or rejection of a ballot measure or candidate." (*Vargas, supra*, 46 Cal.4th at p. 29.)[18]

---

[17] Said the court: "Since plaintiff specifically alleged that public funds were expended for 'promotional,' rather than 'informational,' purposes, his complaint stated a valid cause of action, and the trial court erred in sustaining defendant's demurrer. If plaintiff proves the allegations of his complaint at trial, he will be entitled to at least a declaratory judgment that such expenditure of public funds was improper, and, perhaps, to injunctive relief as well." (*Stanson, supra*, 17 Cal.3d at p. 210.)

[18] That holding solved a potential constitutional problem which the *Stanson* court had identified: What if the Legislature specifically authorized expenditures for partisan campaigning? (See *Vargas, supra*, 46 Cal.4th at p. 29 ["As we have seen, in *Stanson*, . . . this court, after explaining that a 'serious constitutional question . . . would be posed by an explicit legislative authorization of the use of public funds for partisan campaigning' . . . reaffirmed our earlier holding . . . that the use of public funds *for campaign activities or materials* unquestionably is impermissible in the absence of ' "clear and unmistakable language" ' *authorizing* such expenditures. . . . Section 54964 does not *clearly and unmistakably authorize* local agencies to use public funds for campaign materials or activities so long as those materials or activities avoid using language that expressly advocates approval or rejection of a ballot measure. Instead, the provision *prohibits* the expenditure of public funds for communications that contain such express advocacy, even if such expenditures have been affirmatively authorized, clearly and unmistakably, by a local agency itself." (first italics omitted, citations omitted)].)

Following in *Vargas*'s wake, *DiQuisto* likewise upheld expenditures which, though certainly related to an election, did not rise to the level of "campaign" activities. There, in collective bargaining negotiations between a county and several public employee unions, the county bargained for union agreement *not* to support a union-sponsored ballot measure to mandate binding arbitration with the county. Plaintiffs, who were basically allied with the unions, then sued the county for the waste of public resources in "discussing the unions' nonsupport of the proposed ballot initiative." (*DiQuisto, supra*, 181 Cal.App.4th at p. 264.) Importantly, the court recognized that the county's communications could not claim impartiality—after all, the county really *did* oppose the ballot measure. (See *id.* at p. 265.) Even so, the proposals were part of contract negotiations, no election campaign was as yet "underway," and the audience was *not* the " 'electorate per se, but only potentially interested private citizens' " (indeed, the union negotiators themselves!) and there was " 'no attempt to persuade or influence *any* vote.' " (*Id.* at pp. 265–268.) Thus the *DiQuisto* court readily held that the "activity" (really simply using time in negotiations to recognize county opposition to the ballot measure[19]) was not illegitimate campaign activity.

The *DiQuisto* case also involved an e-mail sent by a county supervisor to about 1,500 individuals, encouraging them to "educate themselves" about the ballot measure and attaching a copy of a newspaper editorial that urged a "no" vote on it, an issue which prompted the court to look at section 8314, mentioned above. Section 8314 precludes use of public resources for "a campaign activity," though it defines campaign activity to not include "the incidental and minimal use of public resources, such as equipment or office space, for campaign purposes." (*Id.*, subds. (a), (b)(2).) The union-allied plaintiffs argued that the e-mail, complete with its attachment directly urging a "no" vote on the union-supported measure, constituted express advocacy in violation of the statute. (*DiQuisto, supra*, 181 Cal.App.4th at p. 271.)

Not so, said the appellate court. The e-mail itself merely suggested voters educate themselves about the initiative, it was " 'moderate in tone' " and not exhortatory, and, even though sent out less than a month before the election, its style and tenor still made it essentially informational. (*DiQuisto, supra*, 181 Cal.App.4th at p. 272.)

As for the editorial attached to the e-mail, well, it obviously *did* constitute express advocacy. After all, the editorial explicitly said "vote no" on the union-sponsored ballot measure. (See *DiQuisto, supra*, 181 Cal.App.4th at

---

[19] The union-sponsored ballot measure in *DiQuisto* was met by two county-sponsored countermeasures, so the opinion actually discusses a total of three ballot measures. In our discussion we treat the three measures as essentially one. In the end, they were all defeated. (*DiQuisto, supra*, 181 Cal.App.4th at p. 245.)

pp. 273–274.) However, given the "minimal costs" involved and the supervisor's general intent to inform the recipients of the e-mail on the differences between the union-sponsored measure and two competing county-sponsored measures, the attachment fell within section 8314's definitional exemption for minimal and incidental activities: The court noted testimony from the supervisor's chief of staff that there was "voter confusion" and the editorial "contained a good explanation" of the competing ballot measures. (181 Cal.App.4th at p. 274.) And any expenditure was clearly de minimis, using equipment already in place. (*Id.* at p. 275.)

## 2. Application

Given the structural similarity between Education Code section 7054 and Government Code section 8314 as construed in *DiQuisto*, there is no doubt that *DiQuisto*'s construction of section 8314 sheds light on section 7054. Now, to be sure, there is a small difference in language in the two statutes: Section 7054, subdivision (a) prohibits the use of resources "for the purpose of urging the support or defeat of any ballot measure or candidate," while section 8314, subdivision (a) uses the words "for a campaign activity." And further, there is indeed a detectable difference in the two formulations: One might be able to "urge support or defeat" of a candidate or ballot measure without the traditional paraphernalia of "campaign activity." (E.g., one neighbor privately tells another, "Candidate X stinks, vote for Candidate Y.")

Even so, there is no reasonable difference given the facts of this case. Whatever *purposes* for the first list (remember that count 2 does not encompass the compilation of the second list), it was not *used*, by any stretch of the imagination, to "urge" anything, much less even remotely approach the sort of election-connected materials which were the objects of court attention in *Stanson*, *Vargas*, and *DiQuisto*. Here, the list was a strictly internal document—it didn't even rise to the level of the "inform yourself" e-mail in *DiQuisto*, much less the attachment to that e-mail which explicitly urged a certain vote on a certain measure.[20]

Indeed, this case presents this irony: Neither list expressed any opinion *at all* about the recall. The two lists were just lists of recall supporters,

---

[20] In *Vargas*, the high court considered whether the line between advocacy and information was so vague as to raise a due process issue of vagueness: "[W]e reject the contention that the line drawn in *Stanson* between the use of public funds for *campaign activities* and the use of such funds for *informational material* is unduly or impermissibly vague. As we have seen, the *Stanson* decision explicitly identified a number of materials and activities that unquestionably constitute campaign activities . . . for example, the use of public funds to purchase bumper stickers, posters, advertising 'floats,' or television and radio 'spots' . . . . The circumstance that in *some instances* it may be necessary to consider the style, tenor, and timing of a

correlated in some cases with school attendance boundaries and children in various schools in the District. Thus they were well within the limitations established in *Stanson* or *Vargas*. (See *Vargas, supra*, 46 Cal.4th at p. 36 [*"Stanson* does not preclude a governmental entity from publicly expressing an opinion with regard to the merits of a proposed ballot measure, so long as it does not expend public funds to mount a campaign on the measure."].)

The interpretative theory put forward by the district attorney's office is this: The elements of both (1) use and (2) urging support or defeat of a candidate are individually present here. First, the "use" of public resources is to be found in the time and computer database access used to compile the first list. Second, the "purpose of urging the defeat" of the recall (or, alternatively, of urging the support of the then-incumbent board[21]) is present from the *inference* that Fleming, who is assumed to have disliked the recall because it threatened his job, wanted to put the list to *some* dark purpose that would defeat the recall. (Readers should recall that when pressed by the trial judge as to *how* the list might have been used to defeat the recall, the best the trial deputy handling the case could do was say that Fleming might have used it to actually meet with and talk to recall supporters in order to talk them out of proceeding with the recall. The appellate deputy, at oral argument in this court, recognized that that idea was untenable, but did not actually offer another explanation as to how Fleming might have used the list to defeat the recall.)

The theory, readers may note, bears a close resemblance to the contaminating motive theory that underlies the prosecution's reading of section 424: use plus bad motive equals crime.

Preliminarily, we should recognize that, unlike section 424, motive *is* indeed part of the text of section 7054 insofar as section 7054, unlike section 424, uses the word "purpose."

communication or activity to determine whether, from an objective standpoint, the communication or activity realistically constitutes *campaign* activity rather than *informational* material, does not render the distinction between campaign and informational activities impermissibly vague." (*Vargas, supra*, 46 Cal.4th at pp. 33–34, original italics.)

In the present case, however, the two lists are so far removed from traditional campaign material that we need not explore the "style, tenor and timing" problem. Again, we repeat: Even at the worst, the two lists were compiled for internal eyes only and so never were public communications. There was no mounting of a campaign of any kind. (See *Vargas, supra*, 46 Cal.4th at p. 35.)

[21] For the moment, we will assume, for the sake of argument, that the statutory phrase "any ballot measure or candidate, including, but not limited to, any candidate for election to the governing board of the district" applies to the "nascent" recall effort as it stood in the spring of 2005 even though not enough signatures had been collected to put anything on the ballot. As we shall soon see, such an assumption is faulty.

However, the prosecution's reading of section 7054 is ultimately unconvincing, both textually and practically.

Textually, the district attorney's office's interpretation of section 7054 unnaturally separates the idea of the use of school resources from the purpose of that specific use, so as to read out of the statute any reasonable connection to the idea of "urging support or defeat." Let's take our (previously noncontroversial) example of the football coach who uses school money to buy sleds for the high school football team. The use of the sleds in training may indeed help the team win some games, but if one of the coach's motives is *at all* to help the school board win reelection (after all, a winning high school football team might influence a few voters) the requisition is, under the district attorney's office's theory, literally criminal. There is use, there is motive. Under the theory that's all you need.

Now, no one would seriously contend that the football coach's requisition *is* criminal, but can we articulate why? And the answer is: because there is no reasonable causal relationship between the requisition of sleds so the football team can win some more games and any "urging the support or defeat" of any candidate as is required to violate the statute. An unnatural separation of the use of the resources from a reasonable connection to "urging the support or defeat" in effect reads the words "urging the support or defeat" out of the statute.

Of course, practically, the district attorney's office's interpretation devolves into the absurdity where a school official or even a school teacher who, in using school resources to try to do a good job for a district's students, would be committing a criminal act if one of his or her motivations were to somehow help an incumbent school board. Needless to say, the district attorney's office has not cited any legislative history to the effect that the Legislature actually intended such a draconian result.

And then there is the case law. The interpretation posited by the district attorney's office runs counter to the construction of an analogous statute, section 8314, in *DiQuisto*. Remember—in *DiQuisto* there was indeed "use" of public resources, and that use was more closely tied to an actual ballot measure than the "use" of resources here. In *DiQuisto* the resources were the time spent in the bargaining sessions devoted to the question of whether the unions might drop their support of a particular ballot measure. And there was also motive: The county in *DiQuisto* certainly didn't like the union's proposed ballot measure, much like the district attorney's office has assumed that Fleming didn't like the prospect of a recall here. In fact, the "use" of resources in *DiQuisto*—talking to the union negotiators themselves—is analogous to the use of the lists to facilitate a meeting with recall supporters,

except less directly connected to persuasion. (A little bit like the time spent putting together a meeting, as distinct from the time spent at the meeting itself.) And yet the *DiQuisto* court held that because there was " 'no attempt to persuade or influence *any* vote,' " in those negotiations, there was no illegitimate campaign activity. As the trial court judge noted in the case before us, echoing *DiQuisto*, neither was there any attempt to persuade or influence any vote here.

We may also observe here that the union's theory rejected in *DiQuisto* was analogous to the district attorney's office's in this case: use of resources plus some conceivable connection to a ballot measure violates section 8314. We see no reason in this case to depart from *DiQuisto*'s approach, and need only note again that to depart from it here would effectively read out the words "urging the support or defeat" from the statute.

Finally, there is yet another reason section 7054 was not violated in this case. When the first list was prepared, no recall election had been set—the idea was just an idea floating around. And the possible "nascent" recall in the future when the first list was prepared was clearly not close enough to a real election to come within the ambit of actually "urging" support or defeat of anything.

On that point, *Santa Barbara County Coalition Against Automobile Subsidies v. Santa Barbara County Assn. of Governments* (2008) 167 Cal.App.4th 1229 [84 Cal.Rptr.3d 714] (*Santa Barbara County Coalition*) applies a fortiori. There, a county transportation agency went so far as to actually *hire a political consultant* to survey voter support for a possible extension of a sales tax so as to fund various projects the agency hoped to implement. The consultant determined which arguments for the extension of the tax might be received most favorably by the voters and the "best strategy" to "maximize" voter support for it. (*Id.* at p. 1234.) And yet that hiring did *not* offend the rules articulated by our high court in *Stanson* or *Vargas* because all the activity happened *before* any measure had been placed on any ballot. (See *Santa Barbara County Coalition, supra*, 167 Cal.App.4th at p. 1239 ["Although a government agency cannot spend public funds in a partisan campaign for the passage or defeat of a ballot measure, we conclude that, in this case, the activity of [the transportation agency] was not electoral advocacy because it was in furtherance of its express statutory duties and occurred before Measure A was qualified for placement on the ballot."].) As Justice Moreno would later summarize *Santa Barbara County Coalition* in *Vargas*: "The Court of Appeal's conclusion that [the transportation agency's] actions did not constitute unlawful campaign activity largely turned on the fact that *all the activity at issue had occurred before the measure was placed on the ballot*." (*Vargas, supra*, 46 Cal.4th at p. 45 (conc. opn. of Moreno, J.), italics added.)

To the same effect is *League of Women Voters v. Countywide Crim. Justice Coordination Com.* (1988) 203 Cal.App.3d 529, 550 [250 Cal.Rptr. 161], where the court recognized the need for some real, *scheduled*, election. As the court said: "Clearly, prior to and through the drafting stage of a proposed initiative, the action is not taken to attempt to influence voters either to qualify or to pass an initiative measure; *there is as yet nothing to proceed to either of those stages. The audience at which these activities are directed is not the electorate per se, but only potentially interested private citizens; there is no attempt to persuade or influence any vote* . . . . It follows those activities cannot reasonably be construed as partisan campaigning." (203 Cal.App.3d at p. 550, italics added, citation omitted.)

Here, as the district attorney's office acknowledges, the recall campaign was only "nascent" in regard to the first list. Nothing had qualified for any ballot. The lists were strictly internal, hence clearly *not* devoted to "urging" support or defeat of anyone or anything.

In sum, the compilation of the first list did not come within section 7054's prohibition against using school district resources "for the purpose of urging" defeat of a recall. The trial court was therefore correct to dismiss count 2.

#### C. *The District Attorney's Office's Appeal on Count 3*

While the grand jury indictment alleges that Fleming and McGill conspired, within the meaning of Education Code section 49076 "to access" pupil records without parental consent or judicial order, the district attorney's office, conceding that Fleming and McGill accessed no *confidential* pupil records, has effectively abandoned any argument that Fleming and McGill *conspired to violate* or actually *violated* Education Code section 49076.[22] As the case is now presented to us in the district attorney's office's appeal on the dismissal of the third count, the main argument is that Fleming and his assistant McGill conspired to have the lists prepared for their own illegitimate use, which violated section 182, subdivision (a)(5).

---

[22] All undesignated references in this opinion to "section 49076" are to the Education Code. Section 49076 provides in pertinent part:

"A school district is not authorized to permit access to pupil records to any person without written parental consent or under judicial order except that:

"(a) Access to those particular records relevant to the legitimate educational interests of the requester shall be permitted to the following:

"(1) School officials and employees of the district, members of a school attendance review board appointed pursuant to Section 48321, and any volunteer aide, 18 years of age or older, who has been investigated, selected, and trained by a school attendance review board for the purpose of providing followup services to pupils referred to the school attendance review board, provided that the person has a legitimate educational interest to inspect a record."

The Penal Code provision on which the indictment is based makes illegal conspiring: "To commit any act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due administration of the laws."[23]

There is no argument that Fleming and McGill conspired to do anything "injurious" to the public health or morals. We gather, rather, from the district attorney's office's briefing that Fleming and McGill conspired to do acts "to pervert or obstruct justice, or the due administration of the laws." More specifically, the idea is that by agreeing "to use district resources to further their own personal purposes," Fleming and McGill thereby agreed to obstruct justice or the due administration of the laws.[24]

We have already rejected the underlying substance of this conspiracy theory. As shown above, *even if* Fleming and McGill had, as one of their motives in compiling the list, the hope of, in some way, eventually heading off the recall (we have called this the "contaminating motive" theory of § 424), they were still within their lawful authority to compile the lists, and the compiling in no way constituted a violation of section 7054.

Moreover, there is no reasonable connection between the compiling of the lists and anything that even remotely resembles classic obstruction of justice or the due administration of the laws. We may illustrate by contrasting what happened here with two California Supreme Court cases that figure prominently in the district attorney's office's briefing.

First is *Lorenson, supra*, 35 Cal.2d 49. *Lorenson* could have been the basis for a film noir screenplay. A 1950's Los Angeles police captain despised a dishonest businessman, who allegedly took away a widow's house for a $9 repair bill. So the police captain orchestrated a beating of the businessman. But when the suspects in the beating were brought to the police station, they (mysteriously) were let go, thus hampering the investigation of the assault on the businessman. That, and recordings that might have linked the police captain to the assault went missing.

---

[23] Subdivision (a) of section 182 provides in part:

"(a) If two or more persons conspire:

"(1) To commit any crime. [¶] . . . [¶]

"(5) To commit any act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due administration of the laws."

[24] To quote from the district attorney's office's brief: "Likewise, the evidence in the instant case supports the inference Fleming and McGill conspired to commit acts to pervert or obstruct justice, or the due administration of the laws. Based on the transcripts of the grand jury proceeding it can reasonably be inferred that the object of their conspiracy was to use district resources to further their own personal purposes."

*Lorenson* was a classic case of obstruction of justice—the police captain hid evidence that tied him to the beating. (See *Lorenson, supra,* 35 Cal.2d at pp. 59–60 ["A conspiracy with or among public officials not to perform their official duty to enforce criminal laws is an obstruction of justice and an indictable offense at common law . . . . In the same category is a conspiracy to obtain the release of a person charged with a felony by presenting a worthless and void bail bond. Such a conspiracy has been held to be a perversion of the due administration of the law, and an offense within the meaning of subdivision 5 of section 182 of the Penal Code." (citation omitted)].) But in this case there is no argument that Fleming or McGill had any duty to enforce criminal laws, or *hid* any "evidence."

Second is *Calhoun v. Superior Court* (1955) 46 Cal.2d 18 [291 P.2d 474]. There, a county supervisor was indicted in what was essentially a shakedown scheme to extort campaign contributions from liquor licensees. But in this case there is no assertion, and certainly no evidence, that Fleming or McGill used, or *ever planned to use,* the lists in this case to intimidate or harass any recall supporters or their children.

The district attorney's office relies on *People v. Martin* (1982) 135 Cal.App.3d 710 [185 Cal.Rptr. 556] for the proposition that a conspiracy under section 182, subdivision (a)(5) can consist entirely of legal actions, even without a criminal objective. In that regard the district attorney's office points to section 182, subdivision (a)(1), which already makes conspiracies to commit crimes illegal—the suggestion seems to be that if a prosecutor deems an action somehow wrongful, even if not criminal, that can be a basis for a conspiracy charge under section 182.

█ In the first place, we have already noted that the statute itself requires a conspiracy to pervert or obstruct justice, or the due administration of the laws. And the district attorney's office's briefing in this case never explains *how—independent of any substantive violation of section 424 or section 7054*—the compiling of the lists could constitute "perversion or obstruction of justice, or the due administration of the laws."

But in any event, the theory relies on an overreading of *Martin.* All criminal conspiracies require at least a *criminal objective,* even if all the specific actions taken to implement that criminal objective are otherwise not criminal.[25]

---

[25] The idea that conspiracies do not require any criminal *acts* (other than the agreement itself, of course) is not a revelation. Here is a hypothetical to illustrate how an obvious criminal conspiracy can exist without any overt criminal acts other than the initial agreement: Suppose Plum and Scarlet agree to kill Mustard in the library of a country house. Plum, owner of the house, invites Mustard to stay for the weekend, and Scarlet, also staying for the

Indeed, the facts in *Martin* itself readily show the need for a *criminal* objective. There, a municipal court judge had an arrangement with a criminal defense attorney to give that defense attorney's clients special treatment in driving-under-the-influence cases. The special treatment took a number of forms: The judge would have docket sheets falsified to show that deputy district attorneys handling drunk driving cases had agreed to reduced charges in cases where the deputies would never have so agreed (*Martin, supra*, 135 Cal.App.3d at p. 715). The judge would declare prior drunk driving convictions unconstitutional so they would be stricken, in the process falsifying docket sheets to make it look like a deputy had been present in court to object (when the deputy hadn't been in court). (*Id.* at pp. 715–716.) The judge would also give a defendant who was required to serve a minimum of 48 hours in county jail credit for having already served those hours, when in fact the defendant hadn't. (*Id.* at p. 716.) And the judge would reduce the usual fine for defendants of the favored attorney. (*Ibid.*) As the appellate court pointed out in rejecting the judge's argument that the elements of conspiracy had not been established (see *ibid.*), there was enough evidence to show "the intent to commit the offense which is the object of the conspiracy" (see *id.* at p. 722) because there was enough evidence to show "an intent to do the acts constituting the elements of an obstruction of justice." (*Ibid.*)[26] In *Martin*, as in *Lorenson*, that criminal objective was obstruction of justice.

weekend, buys an exceptionally heavy candlestick with which to bash Mustard over the head at an opportune time. But nothing else happens. There might be no *murder*, and all specific actions taken to implement the conspiracy might otherwise not have "constituted criminal conduct" (see *Martin, supra*, 135 Cal.App.3d at p. 714), but there still would have been a prosecutable conspiracy to commit murder, because the *objective* was criminal.

[26] There is some fine parsing of ideas to be found at page 722 of the *Martin* opinion as it appears in the official reporter, as related to the fact that the judge in *Martin* actually hadn't taken anything of value from the favored attorney. Thus the *Martin* court said: "Contrary to Martin's contention, a showing of an 'evil or corrupt motive' is not required," to which it cited *People v. Saugstad* (1962) 203 Cal.App.2d 536, 542 [21 Cal.Rptr. 740]. (*Martin, supra*, 135 Cal.App.3d at p. 722.) The point was that it was enough the defendant had "an intent to do the acts" which made up the obstruction of justice charge.

But just because an *evil or corrupt* motive is not necessary to commit a conspiracy, does not mean that *an intent to do acts constituting a criminal objective* is not needed. It still is. The *Martin* court's citation to *Saugstad* is instructive in that regard. There, the conspiracy was between a car dealer, his general manager, and a "deskman" to do acts which violated a specific section of the Vehicle Code by failing to file with the Department of Motor Vehicles original reports of sales on new cars that were returned. That way, the "new" car could still be sold as a "new car" even though it was in fact used. Even in the process of rejecting the argument that evil motive or corrupt intent is required, the *Saugstad* court made it clear that there was still a need to show an intent to do acts that actually constituted a crime. Here is the salient passage: "Appellants argue that a corrupt motive and a joint evil intent are necessary to constitute the crime of conspiracy and rely heavily upon a statement in *People v. Eiseman* [(1926)] 78 Cal.App. 223 . . . , at page 247 [248 P. 716], 'that a corrupt motive was an essential element of the crime of conspiracy.' The quoted phrase is a loose statement of the law. (1) We believe that the rule is correctly stated in 1 Wharton, Criminal Law and Procedure (Anderson), section 85, as follows: 'Analytically a dual mental state is present in the case of

We have already eliminated all possible *criminal objectives* based on the compilation of the lists. Fleming and McGill were within the authority of the law to compile the lists. It is fundamental that no one can be held criminally liable for conspiracy to do acts that are perfectly lawful and to which there is no criminal objective. The trial court was therefore correct to dismiss count 3.

D. *The District Attorney's Office's Delay Contention*

Lastly, there is the argument that, by virtue of section 1510 of the Penal Code,[27] Fleming simply brought his attack on the indictment in the trial court too late. Section 1510 provides: "The denial of a motion made pursuant to Section 995 or 1538.5 may be reviewed prior to trial only if the motion was made by the defendant in the trial court not later than 45 days following defendant's arraignment on the complaint if a misdemeanor, or 60 days following defendant's arraignment on the information or indictment if a felony, unless within these time limits the defendant was unaware of the issue or had no opportunity to raise the issue."

Fleming was arraigned in July 2007. He did not file his section 995 motion to set aside the indictment for an absence of probable cause until more than two years later, in October 2009. The question is thus whether Fleming comes within one of the two exceptions to section 1510, either (1) lack of awareness of the issue or (2) lack of an opportunity to raise it.

 The law on point has been summarized in *Ghent v. Superior Court* (1979) 90 Cal.App.3d 944, 950–951 [153 Cal.Rptr. 720] (*Ghent*): "*Section 1510 does not prevent a defendant in a felony prosecution from making a section 995 motion at any time before trial*; it operates only to preclude pretrial appellate relief from an order denying one which (1) was made more than 60 days after his arraignment and (2) does not fall within either of the exceptions for which section 1510 expressly provides . . . . The 60-day bar may therefore not be asserted in the trial court when he makes the motion, and it must be raised in the appellate court when he challenges an order of denial by filing a petition for extraordinary relief pursuant to section 999a. Once it is raised and established in the appellate court, he bears the burden of showing that he is within one exception or the other. The stop-or-go question thus presented is whether the bar applies or one of the exceptions does, and the answer turns upon *a determination of fact to be made by the appellate court*." (Italics added, citation & fn. omitted.)

---

conspiracy. There is both (1) the intent or agreement of the parties to act together, and (2) *the intent to commit an unlawful act or to commit a lawful act by unlawful means, or to do an act jointly which the law makes illegal when done by two or more persons.' " (*Saugstad, supra*, 203 Cal.App.2d at pp. 541–542, italics added.)

[27] All further undesignated references to "section 1510" will be to the Penal Code.

In the present case, both unawareness and lack of opportunity are present.

As to awareness, there is one published opinion, *People v. Webster* (1991) 54 Cal.3d 411 [285 Cal.Rptr. 31, 814 P.2d 1273] (*Webster*), that has dealt with the problem of ineffective assistance of counsel in the section 1510 context. *Webster* rejected an ineffective assistance claim because the defendant could show no actual prejudice from his attorney's failings. We think the fair implication of *Webster* is that if there is ineffective assistance in not timely bringing a meritorious section 995 motion, then the section 995 motion may be reviewed on the merits. We note in particular that the section 995 motion in *Webster* involved issues that were actually considered on the merits pretrial and could also be considered by way of regular appeal posttrial.[28]

This case, by contrast with *Webster*, is full of prejudice from Fleming's prior counsel's ineffective assistance. We have already demonstrated that the prosecution's legal theories are untenable. Forcing Fleming to suffer the expense of trial based on those theories would be a miscarriage of justice. And, in contrast to *Webster*, the section 995 motion *was* brought pretrial, so there is no appreciable prejudice to the prosecution for the delay: The district attorney's office has lost nothing by consideration of Fleming's section 995 motion on the merits. We stress again: We have considered the merits of Fleming's section 995 motion as presenting a strictly legal issue based on the district attorney's office's own version of the facts, and even under that version (i.e., that Fleming himself ordered subordinates to compile the lists, and in so ordering them he had at least *a* motivation that was in some way antithetical to the recall), Fleming still committed no crime.

There is also the matter of transcripts. The grand jury transcripts in this case are voluminous—no fewer than five volumes (and that's not counting exhibits, which take up the better part of two volumes). Those volumes would necessarily have had to be read and digested by Fleming's counsel to present

---

[28] One should bear in mind that the section 995 issue came up after the defendant had already been convicted of murder after a jury trial, and that two members of the gang of transient "outlaws" who were involved in the killing *did* bring timely section 995 motions, but those motions were denied on the merits. Moreover, the basis for the hypothetical section 995 motion was a *search and seizure claim* (see *Webster, supra*, 54 Cal.3d at p. 433) that could be readily preserved for review by regular appeal. Here is the salient text: "The appellate record fails to disclose the reasons for counsel's conduct. Even if we assume that counsel could have had no sound tactical purpose (see *People v. Pope* (1979) 23 Cal.3d 412, 425–426 [152 Cal.Rptr. 732, 590 P.2d 859]), defendant fails to show prejudice warranting reversal. Madrigal and Williams [(other members of the outlaws)] did seek writ review of the section 995 denial; their petition properly raised the lying-in-wait and search-and-seizure issues common to all the defendants. The Court of Appeal summarily denied pretrial relief, and defendant fails to show that the result might have been different had he joined the petition." (*Webster, supra*, 54 Cal.3d at pp. 434–435, italics omitted.)

a section 995 motion. Particularly given the voluminous record and the delay in the actual preparation of the transcripts and forwarding to counsel (even if the record was technically finalized prior to the arraignment), it is unlikely all the reading could have been completed, much less a proper motion prepared, in 60 days. (Accord, *Ghent, supra,* 90 Cal.App.3d at p. 952 [transcript delay one of reasons that defendant was within "no opportunity" exception to § 1510].)

## IV. CONCLUSION

Let us make clear what we do *not* say. We express absolutely no opinion about the merits of the recall effort, or Fleming's administration of the District. Those are political matters beyond the purview of this court. Nor do we express any opinion about any *civil* suits or settlements that might have arisen out of the lists. *This* case only concerns *criminal* charges brought against the former superintendent.

Moreover, this opinion should in no way be read as countenancing the *actual political use* of a list of recall supporters as part of a political *campaign* opposing a recall of a school board. Nor should this opinion be read for the idea that the *use* of a list of recall supporters to in any way intimidate or disadvantage the children of recall supporters would not be, in some way, within the reach of the law. (Exactly how we need not say now.)

But let us also make clear what we *do* say. The district attorney's office has presented no evidence whatsoever that the lists were used in any political campaign, or that they were used to intimidate anybody, or that any child in the District was in any way affected by those lists or their preparation. Their compilation was *not criminal.*

This case in fact recalls the recent concurrence of the Chief Judge of the Ninth Circuit in *U.S. v. Goyal* (9th Cir. 2010) 629 F.3d 912 (conc. opn. of Kozinski, C. J.). *Goyal* was a case where the defendant clearly did something *wrong*, even if not criminal—a far cry from a school superintendent who might have been legitimately curious about the demographic characteristics of people who were dissatisfied with him and his policies. Chief Judge Kozinski's observations are, if anything, more readily applicable to this case than they are to Goyal's, and even if they are directed to federal, rather than as here, state prosecutors: "This case has consumed an inordinate amount of taxpayer re- sources, and has no doubt devastated the defendant's personal and professional life . . . . This is just one of a string of recent cases in which courts have found that federal prosecutors overreached by trying to stretch criminal law beyond its proper bounds. [Citations.] [¶] This is not the way criminal law is suppose to

work. Civil law often covers conduct that falls in a gray area of arguable legality. But criminal law should clearly separate conduct that is criminal from conduct that is legal." (*Id.* at p. 922 (conc. opn. of Kozinski, C. J.).)

The trial court's judgment dismissing counts 2 and 3 is affirmed. The trial court is directed to enter judgment dismissing count 1.

Rylaarsdam, J., and Moore, J., concurred.

A petition for a rehearing was denied January 19, 2011, and the opinion was modified to read as printed above. The petition of real party in interest for review by the Supreme Court was denied, March 23, 2011, S190202.